# IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

FLAME S.A.,                 )

      Plaintiff,        )

GLORY WEALTH SHIPPING PTE LTD.  )

      Consolidated Plaintiff,   )

vs.                )

INDUSTRIAL CARRIERS, INC.     )
VISTA SHIPPING, INC., and      )
FREIGHT BULK PTE. LTD.,      )

      Defendants.     )

Underlying Litigation:
Case Nos: 2:13-cv-658; 2:13-cv-704
United States District Court
Eastern District of Virginia

## DECLARATION OF ROBERT HAMBURG IN SUPPORT OF SPECIALLY APPEARING DEFENDANT FREIGHT BULK PTE. LTD.'S MEMORDANDUM OF LAW IN SUPPORT OF ITS MOTION TO COMPEL COMPLIANCE WITH SUBPOENAS ISSUED TO HOLLAND & KNIGHT LLP AND JAMES H. POWER

I, Robert Hamburg, declare and state:

I am an attorney with the law firm of Mayer Brown LLP, counsel for Freight Bulk Pte Ltd. ("FBP") in the above-captioned matter. I make this declaration in support of Specially Appearing Defendant FBP's Memorandum in Support of its Motion to Compel Compliance Subpoenas Issued to Holland & Knight LLP and James H. Power.

1) Attached hereto as Exhibit 1 is a true and correct copy of Flame S.A.'s ("Flame") First Amended Verified Complaint against FBP.

2) Attached hereto as Exhibit 2 is a true and correct copy of Glory Wealth Shipping Pte Ltd.'s ("Glory Wealth") Amended Verified Complaint against FBP.

3) Attached hereto as Exhibit 3 is a true and correct copy of the Declaration of James H. Power In Support of Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.'s Notice of Joinder In Plaintiff Flame S.A.'s Motion to Compel.

4) Attached hereto as Exhibit 4 is a true and correct copy of FBP's Subpoena to Produce Documents issued to Holland & Knight LLP.

5) Attached hereto as Exhibit 5 is a true and correct copy of FBP's Subpoena to Produce Documents and Testify at a Deposition issued to James H. Power, Esq.

6) Attached hereto as Exhibit 6 is a true and correct copy of Responses and Objections of Holland & Knight LLP and James H. Power to Subpoenas for Production of Documents and Testimony.

I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Executed: May 12, 2014

/s/ _Robert W. Hamburg_

Robert W. Hamburg
**MAYER BROWN LLP**
1675 Broadway
New York, NY 10019-5820
Tel: (212) 506-2500
Fax: (212) 262-1910

*Counsel to Specially Appearing Defendant*
*Freight Bulk Pte Ltd.*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FLAME S.A.,

    Plaintiff,

v.                            Civil Action No.: 2:13-cv-658

INDUSTRIAL CARRIERS, INC.,
VISTA SHIPPING, INC.,
FREIGHT BULK PTE. LTD., and
VICTOR BARANSKIY,

    Defendants.

**PLAINTIFF FLAME S.A.'S
FIRST AMENDED VERIFIED COMPLAINT**

Plaintiff, FLAME S.A. (hereinafter, "Plaintiff"), by and through its attorneys, Crenshaw, Ware & Martin and Blank Rome LLP (*pro hac vice*), files its First Amended Verified Complaint, as directed by the Court, against Defendants INDUSTRIAL CARRIERS, INC., (hereinafter "ICI") VISTA SHIPPING INC. (hereinafter "Vista"), FREIGHT BULK PTE. LTD. (hereinafter "FBP"), and VICTOR BARANSKIY (collectively "Defendants," unless otherwise specified) alleges:

**Preliminary Statement**

1.    In the fall of 2008 the freight rates in the shipping market, and in particular the bulker market, crashed. ICI was, financially, on the wrong side of the crash and took heavy losses. ICI, however, never felt those losses, because it transferred all of its cash and assets to Vista, FBP, and Baranskiy.

1

2.     This action involves the recovery of a foreign judgment in the sum of USD $19,907,118.36 (hereinafter referred to as the "Judgment"), entered in favor of the Plaintiff as against the defendant ICI.

3.     On December 22, 2010, an action commenced in the United States District Court for the Southern District of New York, seeking recognition of the foreign judgment invoking the Court's admiralty jurisdiction pursuant to 28 U.S.C. § 1333 and Rule 9(h) of the Federal Rules of Civil Procedure.  Attached is a true copy of the Verified Petition to Enforce Foreign Judgment Pursuant to Uniform foreign Money-Judgments Recognition Act.  The Judgment was recognized by the United States District Court for the Southern District of New York on September 14, 2011.

4.     The Judgment was entered in the Southern District of New York on October 4, 2011.

5.     The Judgment was registered in the Eastern District of Virginia on October 11, 2013.

6.     As will be shown in greater detail below, the defendants ICI, Vista and FBP are dominated, controlled and operate as a single enterprise under the direction and control of Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov, and Daniel Su.

7.     Further, as will also be demonstrated below, Vista and FBP were formed and funded from the fraudulent bulk transfer of cash from ICI.

8.     ICI transferred cash to Vista and FBP to avoid paying its creditors.

### Jurisdiction and Venue

9.     This is a case of admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of

Civil Procedure in that it involves a claim for the enforcement of a maritime judgment, the underlying basis of which was a claim for breach of four maritime contracts called Forward Freight Swap Agreements.  The Court also has supplemental and/or ancillary jurisdiction over any and all non-maritime claims, if any.

10.    The Plaintiff brings this claim against Defendants pursuant to Rule B of the Supplemental Rules of Admiralty and Maritime Claims of the Federal Rules of Civil Procedure for maritime attachment and garnishment of the property of Defendants within this District.

## The Parties

11.    At all times relevant hereto, Plaintiff was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of Switzerland, with an office and principal place of business in Switzerland.

12.    At all times material hereto, defendant ICI was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country.

13.    ICI was, at all times relevant herein, registered to do business in New York and was a party in multiple lawsuits filed in the Southern District of New York.

14.    Plaintiff has registered a foreign maritime judgment against defendant ICI in this District.

15.    At all times material hereto, defendant Vista was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country.

16.    Vista was, at all times relevant herein, registered to do business in the State of New York.

17.   At all times material hereto, defendant FBP was, and now is, a corporation or other business entity duly organized and existing under and by virtue of the laws of a foreign country.

18.   At all times material hereto, defendant Viktor Baranskiy was, and now is, a foreign citizen and resident of the Ukraine.

19.   Vista and FBP are the beneficial and registered owners, respectively, of the M/V CAPE VIEWER. The M/V CAPE VIEWER is now, or will shortly be, within the District of Virginia.

## Background Facts To The Instant Litigation

20.   The individuals in managerial control of defendants ICI, Vista and FBP - in particular Mr. Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su - and the entities within that group, have and continue to disregard corporate form. Accordingly, the Defendants are, and should be considered, alter egos of each other and liable for the debts and obligations of one another.

21.   At all times herein mentioned, the M/V CAPE VIEWER was, and now is, a vessel beneficially owned by VISTA. FBP, an alter ego of Vista, is listed as the Registered Owner of the M/V CAPE VIEWER, however, Vista purchased the M/V CAPE VIEWER with the funds fraudulently transferred out of ICI.

22.   At all times herein mentioned Vista was the beneficial owner of the M/V CAPE VIEWER, operating, managing, controlling and manipulating the vessel for its own use under the direction of the "former" ICI personnel; namely, Mr. Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su.

a) **The London Proceedings.**

4

23.    The relevant documents that support that factual background regarding this litigation are attached to the accompanying Declaration of William R. Bennett, III (with exhibits), and the same are incorporated herein. All references to Exhibits herein refer to the Exhibits attached to the Declaration of William R. Bennett, III.

24.    As part of its trading activities, Plaintiff and ICI entered into four (4) Forward Freight (Swap) Agreements (hereinafter referred to as the "Agreements") dated March 12, 2008, May 19, 2008, August 14, 2008, and August 29, 2008.

25.    Forward Freight (Swap) Agreements are derivative contracts. The value of the contracts is derived from a freight rate for a specific physical trade route which received a daily assessment on one of the Baltic Exchange Indices.   The Agreements served as a means of hedging exposure to freight market risk by providing for the purchase and sale of a freight rate along a named voyage route over a specified period of time.

26.    Forward Freight (Swap) Agreements are cash settled each month. On settlement, if the contract rate is less than the average of the rates for the contract route over the contract period, as determined by reference to the relevant index, the seller of the Forward Freight (Swap) Agreement is required to pay the buyer an amount equal to the difference between the contract rate and the settlement rate multiplied by the number of days specified in the contract. Conversely, if the contract rate is greater than the settlement rate the buyer is required to pay the seller the settlement sum.

27.    In mid to late September 2008, freight rates in the shipping market began to crash. ICI's financial obligations increased dramatically.

28.    Pursuant to the terms and conditions of the Agreements, ICI defaulted and breached the Agreements. In particular, on or about October 15, 2008, defendant ICI applied to

the Piraeus Multimember Court of First Instance (Ex-Parte Jurisdiction – Admiralty Division, Piraeus, Greece) for the granting of a petition for bankruptcy and for the appointment of a Reporting Judge and a Receiver in respect of its affairs.

29.     The October 15, 2008 bankruptcy application was an Event of Default within the meaning of section 5(a)(vii)(6) of the Agreements in that ICI had, by that application, "*[sought] the appointment of a ... receiver, trustee, custodian or other similar official for it or for all or substantially all its assets.*"

30.     Pursuant to section 6(a) of the Agreements, the October 15, 2008 bankruptcy application was an Event of Default within the meaning of section 5(a)(vii)(6) and gave rise to a right of Early Termination of the Agreements.

31.     Clause 9(f) of the Agreements provides for Automatic Early Termination to apply to both parties, therefore, the Agreements were automatically terminated by reason of ICI's October 15, 2008 bankruptcy application.

32.     In or about November 2010, Plaintiff commenced an action in London, England against ICI to recover the amounts due and owing under the Agreements. Exhibit A are true and correct copies of the Claim Form and the Particulars of Claim which were filed in the High Court of Justice, Queen's Bench Division, Commercial Court Registry in London, England.

33.     On December 13, 2010, the High Court of Justice, Queen's Bench Division, Commercial Court Registry entered a judgment for Plaintiff as against ICI and ordered ICI to pay Plaintiff a total of USD $19,907,118.36 (hereinafter referred to as the "Judgment"). Exhibit B is a true and correct copy of the Judgment for Claimant (Plaintiff herein) issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry, London, England.

34.     Pursuant to the Order issued by the High Court of Justice, Queens Bench Division, Commercial Court Registry, defendant ICI is obliged to pay Plaintiff $19,907,118.36, excluding post-judgment interest and attorney's fees.

35.     The Order issued by the High Court of Justice, Queen's Bench Division, Commercial Court Registry is a final Judgment, conclusive and enforceable in England.

36.     The $19,907,118.36 Judgment against defendant ICI in the High Court of Justice, Queen's Bench Division, Commercial Court Registry remains unpaid to date, though payment has been duly demanded.

37.     Defendant ICI's October 15, 2008 bankruptcy application was ultimately rejected on the basis that the Centre of Main Interest ("COMI") was not in Greece. Accordingly, ICI is still actively registered company in the Marshall Islands.

b) **Litigation in the Southern District of New York.**

38.     Plaintiff, having obtained a Judgment against defendant ICI in the High Court of Justice, Queen's Bench Division, Commercial Court Registry, obtained confirmation of the Judgment in the United States District Court for the Southern District of New York.

39.     By Order dated September 14, 2011, the United States District Court for the Southern District of New York granted Plaintiff's motion for recognition of a foreign judgment pursuant to Fed. R. Civ. P. 55(b)(2). A copy of the September 14, 2011 Order is Exhibit C.

40.     A judgment confirming and recognizing the foreign Judgment issued by the High Court of Justice in London, England in favor of Plaintiff and against ICI in the amount of $19,907,118.36 was entered on October 4, 2011. A copy of the October 4, 2011 judgment is Exhibit D.

**c) Litigation in the Eastern District of Virginia.**

41.     A copy of the October 4, 2011 judgment was registered in the United States District Court Eastern District of Virginia on October 17, 2013. A copy of the October 17, 2013 registration is Exhibit E.

**The Instant Action**

42.     This action is brought, in the first instance, to obtain enforcement of a foreign money judgment recognized in the Southern District of New York, in favor of Plaintiff and against Defendant ICI.

43.     This action is also brought to demonstrate that ICI committed a fraud by fraudulently transferring cash to defendants Vista and FBP to avoid paying its creditors, including Plaintiff.

44.     This action is also brought to demonstrate that the defendants are alter egos of one another and hence liable for the Judgment debt of ICI to Plaintiff.

45.     One or more of the Defendants have property now, or soon to be, in the Eastern District of Virginia. This action is also brought to attach such property pending judgment in favor of Plaintiff and against the Defendants in this action.

46.     Defendants have a commonality of operation, control, and routinely transfer funds between each other such that entities within the group are alter egos of the others.

47.     The individuals in managerial control of Defendants ICI, Vista, and FBP - in particular Mr. Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su - and the entities within the "ICI group," disregard corporate form, and the Defendants herein are and should be considered alter egos of each other and thus liable for the debts and obligations of one another.

48.     Defendants disregard their own corporate form and deal with the other members of the group absent an arm's-length relationship.

49.     Defendants possess, transfer and/or hold funds of, or for the benefit of, one another, and make and receive payments for, and on behalf of, the other Defendants, pooling the resources without regard to corporate separateness, and without entering into an arm's-length negotiated contract to provide such services. As such, each of the Defendants is a proper party to be identified in the process of attachment to be issued herein.

50.     In support of these fraud and alter ego allegations, Plaintiff further alleges the following:

a)  The officers, directors, operators and owners of each of the Defendants are the same and/or are substantially the same. In particular, Viktor Baranskiy is a controlling shareholder, director and/or officer of defendants ICI, Vista, and FBP.

b)  Viktor Baranskiy directly or indirectly owns the Defendants, in whole or in part, and ultimately exercises complete dominion and control over all the Defendants, whether or not he owns a controlling share in any particular Defendant.

c)  Upon information and belief, Michael Ivanov is a director and/or officer in the chartering department of defendants ICI, Vista, and FBP.

d)  Upon information and belief, Vladimir Ivanov is a director and/or officer in the operations department of defendants ICI, Vista, and FBP.

e)  Upon information and belief, Vladimir Yudaev is a director and/or officer in the operations department of ICI and a shareholder and director and/or officer in the chartering department of Vista and FBP.

f) ICI, as a corporate practice, routinely disregarded corporate formalities. As evidenced by the financial statements, audited by PricewaterhouseCoopers, ICI owned and controlled the following companies for the sole purpose of being a depository for money due and owing ICI:

    i.   Weaver Investment, Inc.

    ii.   Selene Ship Management S.A.

    iii.   Auster Marine Co.

    iv.   Treselle Navigation Ltd.

    v.   Cardinia Management Co.

    vi.   Tempest Service Inc.

g) It is not the general practice in the maritime community, or in any other business, for independent companies to make or receive large payments on behalf of other independent companies, yet such payments were, and are, made and received regularly by the six affiliated companies for ICI. Indeed, the sole activity of these six companies was to maintain bank accounts for the sole purpose to receive funds for ICI.

h) At all relevant times herein, ICI created and operated an incestuous group of companies with the sole purpose of ICI avoiding its debts by defrauding creditors.

i) The practice of directing payments to its wholly owned subsidiaries was utilized by ICI to evade creditors.

j) ICI issued invoices requesting payments to these corporate entities. The most common beneficiary was Weaver Investment, Inc. Invoices sent to Plaintiff requested payment to ICI to an account at HSBC Bank in Piraeus in the name of

Weaver Investment Inc., Selene Ship Management S.A., Auster Marine Co., and Treselle Navigation Ltd.

k) Payments sent or received on behalf of another independent company without due consideration, and without written agreements, are suggestive of a relationship that is not at arm's length. This fraudulent activity, which occurred between 2006 and 2008, was pervasive.

l) On June 24, 2008, Vista was incorporated in the British Virgin Islands with the primary purpose to receive cash and assest transfers from ICI.

m) On June 30, 2008, ICI's Interim Semi-Annual Financial Statements for January 1 – June 30, 2008 indicated a cash and cash equivalent amount of US $39,236,853.00, and a profit of US $80,627,022.00.

n) On October 15, 2008, defendant ICI, a mere six (6) weeks after recording cash on hand of nearly $40,000,000, applied to the Piraeus Multimember Court of First Instance (Ex-Parte Jurisdiction – Admiralty Division) for the granting of a petition for bankruptcy. At the time of the bankruptcy filing, ICC's financial position indicated a cash and cash equivalent amount of €311,377.06 and US $2,733,854.52, with total losses of US $15,504,000.

o) Using cash it illegally received from ICI, Vista began operating ships, with voyages commencing in December 2008.

p) On December 18, 2012, the M/V CAPE VIEWER was bought by Vista, under the name of FBP, unencumbered by a mortgage. Buying a vessel unencumbered, i.e., without a mortgage, is not simply rare in the shipping industry, it's virtually unheard of.

q) The M/V CAPE VIEWER is listed as part of Vista's fleet on Vista's website.

r) FBP, an alter ego of Vista, is listed as the Registered Owner of the M/V CAPE VIEWER. Vista is the beneficial owner of the M/V CAPE VIEWER, being operated, managed, controlled and manipulated by Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su.

s) FBP is owned by Viktor Baranskiy and Vista. Vista, in turn, is controlled or otherwise operated by Viktor Baranskiy, who was a shareholder in ICI.

t) FBP makes no independent business decisions controlling its asset, the M/V CAPE VIEWER. All such decisions are made by Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su.

u) The law firm of MFB, located in London, appeared in London to respond to the proceedings commenced against ICI in London. Shortly thereafter, MFB also represented Vista in purchasing numerous vessels.

v) Vessels owned and operated by Viktor Baranskiy Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su, whether under the name ICI, Vista or FBP employ subsidiaries of ICI, Vista or FBP, namely, Tech Projects, MKTM Ltd. and Columbus to manage their respective vessels. Tech Projects, MKTM Ltd and Columbus employ the same key employees as defendants ICI, Vista, and FBP. Further, MKTM shares the same address as ICI/Baranskiy.

w) Upon information and belief, the Baranskiy family is the beneficial owner of and maintains the same address as ICI, Vista, FBP, and MKTM.

x) Viktor Baranskiy was an 18% shareholder in ICI, which made him the third largest shareholder in ICI, resulting in him having a controlling interest in ICI under applicable law.

y) Viktor Baranskiy controls Vista and Freight Bulk and treats their bank accounts as his own personal accounts.

z) The M/V HARMONY FALCON was the first vessel that Viktor Baranskiy through Vista chartered in October 2008, carrying iron ore from the Ukraine to China.

aa) The HARMONY FALCON was a vessel belonging to ICI as noted in the ICI filings in Greece. The HARMONY FALCON loaded coal in the Ukraine in mid-October 2008 as part of the ICI fleet. After ICI filed for bankruptcy, the vessel came under the control of Vista without any explanation. Upon information and belief, Vista, without any consideration, took control of the ICI fleet of ships.

bb) Vista, without any consideration, took control of the ICI fleet of ships.

cc) ICI had large sums of cash missing from its accounts. Vista has unexplained amounts of cash added to its accounts such that it was able to purchase unencumbered assets valued at nearly $100,000,000.

dd) Viktor Baranskiy has testified that he had access to more than $100,000,000.00 USD of cash. Vista is not a success story, but rather a story of how they are the successor to ICI.

ee) Through Viktor Baranskiy, Vista succeeded ICI taking control of ICI's cash, vessels, assets, key employees, clients and long-term shipping contracts. Vista is ICI.

### The BDO Report

51.     Between mid-September and mid-October 2008, ICI, upon information and belief, transferred tens of millions of dollars of cash.

52.     The BDO report, Exhibit F, is an analysis of the PricewaterhouseCoopers audited financial statements. The report makes the following findings:

a)   A review of ICI's financial statements shows that it was a profitable company that appeared to be in good financial condition.

b)   The company's balance sheet shows that by June 30, 2008, ICI had more than $100 million of equity, which included more than $42 million of cash.

c)   Despite ICI's strong financial performance through August 2008, ICI filed for bankruptcy in Greece on or about October 15, 2008.   Only ICI filed for bankruptcy. ICI's wholly-owned subsidiaries and related parties did not file for bankruptcy.

d)   Because those subsidiaries did not also file for bankruptcy, one would have expected ICI to have listed the amounts held by the subsidiaries as intercompany receivables (or amounts due from related parties) as an asset in the bankruptcy filing.  No such disclosure appears to have been made.

e)   A decrease in accounts receivable means that ICI's cash balance should have increased by $47.6 million after June 30, 2008, but before filing for bankruptcy, on account of the change in accounts receivable.

f)   ICI directed cash payments to subsidiary companies identified as companies created for the sole purpose of receiving cash due ICI and that such an arrangement is unusual.

g) Based on a review of ICI's 2008 balance sheets, there appears to have been a large transfer of cash out of ICI and/or its related companies without explanation.

h) ICI's apparent failure to disclose intercompany receivables due from its subsidiaries in its bankruptcy filing in Greece is not in accordance with standard accounting practices.

i) The analysis of the changes in the balance sheet items indicates that cash to ICI should have increased by $47.6 million on account of the collection of accounts receivable and possibly $20.2 million on account of the bunker inventory.  In addition, cash should have decreased by $25.5 million as a result of the decrease in account payable and $4.5 million from a decrease in the amount owed to shareholders (assuming the debt was not forgiven). Therefore, based upon the available information, one would have expected cash to increase by a total of at least $17.6 million ($47.6 million - $25.5 million - $4.5 million).  If the bunker inventory was sold and not used in the operations, one would have expected cash to increase by $37.8 million ($17.6 million + $20.2 million).  However, cash actually decreased by $39.6 million. **This difference between the expected amount of cash and the actual cash balance is $57.2 million ($17.6 million + $39.6 million).**  When one takes into account that the wholly-owned subsidiaries of ICI have "disappeared," the difference between the expected and actual cash balances is highly suspect.

53.     Upon information and belief, ICI with the intent to deceive and defraud its creditors, including Plaintiff herein, fraudulently conveyed and transferred in bulk all of its cash to its subsidiary companies, which included Vista and, ultimately, FBP.

54.     Based on the foregoing, as well as other activities, the Defendants should be considered a single economic unit with no corporate distinction between or among any of them, rendering each liable for the debts of the other, and all assets of Defendants together should be susceptible to attachment and/or restraint for the debts of ICI.

55.     By virtue of the foregoing, all of the named Defendants are properly considered as liable on the Judgment against ICI in favor of Plaintiff.

56.     The four (4) Agreements called for the application of English law. Under English law, including, but not limited to Section 63 of the English Arbitration Act of 1996, costs, including attorneys' fees, disbursements, and interest are recoverable as part of Plaintiff's main claim.

57.     This action is further brought to obtain security for the additional sums which are recoverable including Plaintiffs anticipated attorneys' fees and costs of collection, all of which are recoverable as part of Plaintiff's claim under English law.

58.     Plaintiff estimates that, as nearly as presently may be calculated, the outstanding sum due under the English Judgment, together with recoverable attorneys' fees, legal expenses, costs, and interest is no less than $21,000,000.00.

59.     Plaintiff reserves the right to amend this First Amended Verified Complaint to seek additional security to the extent that the amount of security sought herein should prove to be inadequate to fully secure Plaintiff.

### Request for Rule B Relief

60.     Defendants cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendants, or any of them, have, or will shortly have, assets within this District and subject to the jurisdiction of this Court assets comprising, inter alia, the vessel M/V CAPE VIEWER, cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendants.

61.     The total amount sought to be attached is no less than USD $21,000,000.00.

**WHEREFORE**, Plaintiff Flame prays:

a. That process in due form of law according to the practice of this Court may issue against Defendants citing them to appear and answer the foregoing, failing which Plaintiff will move for default on the principal amounts owed together with interest, costs, disbursements, and reasonable attorneys' fees;

b. That if Defendants cannot be found within this District pursuant to Supplemental Rule B that all tangible or intangible property of Defendants up to and including USD $21,000,000.00 be restrained and attached, including, but not limited to the vessel M/V CAPE VIEWER, as well as any cash, funds, escrow funds, credits, debts, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or being transferred from or for the benefit of Defendants (collectively hereinafter, "ASSETS") within the possession, custody, or control of such banking institutions and/or any such other garnishees, including, but not limited to T. Parker Host, Inc., who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein.

c. That this Court retain jurisdiction over the matter for any subsequent enforcement action as may be necessary; and

d. For such other, further and different relief as the Court may deem just and proper in the premises.

FLAME S.A.

_____/s/_____

Steven M. Stancliff, VSB No. 73853
*Attorney for Plaintiff Flame S.A.*
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, VA 23510
Tel: (757) 623-3000
Fax: (757) 623-5735
sstancliff@cwm-law.com

- and -

William R. Bennett, III *
Lauren B. Wilgus *
*Attorneys for Plaintiff Flame S.A.*
BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, NY 10174
Tel: (212) 885-5000
Fax: (212) 885-5001
wbennett@blankrome.com
lwilgus@blankrome.com

* *Pro Hac Vice* application pending

## CERTIFICATE OF SERVICE

I hereby certify that on the 9th day of January, 2013, I electronically filed a true and correct copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will then send a notification of such electronic filing to the following counsel of record:

<table>
<tr>
<td>

Patrick M. Brogan
DAVEY & BROGAN, P.C.
101 Granby Street, Suite 300
Norfolk, Virginia 23510
Tel: (757) 622-0100
Fax: (757) 622-4924
Email: pbrogan@daveybroganpc.com
*Attorney for Defendant Freight Bulk PTE, LTD.*

</td>
<td>

Michelle Hess (VSB No. 71080)
HOLLAND & KNIGHT, LLP
1600 Tysons Blvd , Suite 700
McLean, VA 22102
Tel: (703) 720-8600
Fax: (703) 720-8610
Email: michelle.hess@hklaw.com
*Attorney for Consolidated Plaintiff
Glory Wealth Shipping Pte Ltd.*

</td>
</tr>
<tr>
<td>

George M. Chalos (*pro hac vice*)
CHALOS & CO., P.C.
55 Hamilton Avenue
Oyster Bay, New York 11771
Tel: (516) 7 14-4300
Fax: (516) 750-9051
Email: gmc@chaloslaw.com
*Attorney for Defendant Freight Bulk PTE, LTD.*

</td>
<td>

James H. Power (*pro hac vice*)
HOLLAND & KNIGHT, LLP
31 West 52nd Street,
New York, NY 10019
Tel: (212)513-3200
Fax: (212)385-9010
Email: James.power@hklaw.com
*Attorney for Consolidated Plaintiff
Glory Wealth Shipping Pte Ltd.*

</td>
</tr>
</table>

/s/ Steven M. Stancliff
Steven M. Stancliff, VSB No. 73853
*Attorney for Plaintiff Flame S.A.*
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, VA 23510
Tel:  (757) 623-3000
Fax: (757) 623-5735
sstancliff@cwm-law.com

19

# EXHIBIT 2

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA, NORFOLK DIVISION

---

GLORY WEALTH SHIPPING PTE LTD
-against-

INDUSTRIAL CARRIERS, INC., VISTA
SHIPPING INC., FREIGHT BULK PTE LTD.,
SERGEI BARANSKIY, VICTOR BARANSKIY

              Defendants

Civil Action No: 2:13cv658-RGD-LRL
                 2:13cv704-RGD-LRL

**AMENDED VERIFIED
COMPLAINT**

---

Plaintiff, Glory Wealth Shipping Pte Ltd., (**"Glory Wealth"**), by and through its attorneys, Holland & Knight LLP, for its verified complaint and request for maritime attachment order pursuant to Rule B of the Supplemental Admiralty and Maritime Rules of the Federal Rules of Civil Procedure, against Industrial Carriers, Inc. (**"Industrial Carriers"**), Vista Shipping Inc. (**"Vista"**) and Freight Bulk Pte Ltd. (**"Freight Bulk"**), Sergei Baranskiy and Victor Baranskiy (collectively, **"Defendants"**), alleges, upon information and belief, as follows:

1.      This is a case of admiralty and maritime jurisdiction as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure. This Court has jurisdiction over the Defendants by reason that Defendants' property is within the District and by reason of the Defendants' collective activities in the United States which give rise to personal jurisdiction.

2.      At all times material herein, Glory Wealth is and was a business entity organized and existing under the laws of Singapore having an address at 9 Temasek Boulevard 07-00, Suntec City Tower 2, Singapore 038989, Singapore.

3.     At all times material herein, Flame S.A. ("**Flame**") S.A. is and was a business entity organized and existing under the laws of Switzerland, with an office and principal place of business in Switzerland. Flame is also registered with the New York Secretary of State as a foreign business corporation.

4.     At all times material herein, defendant Industrial Carriers is, and was, a foreign corporation or business entity organized and existing under the laws of the Marshall Islands and upon information and belief at all material times herein, maintained a principal place of business in Ukraine.

5.     Defendant Vista was and now is a business entity organized and existing under the laws of a foreign country.

6.     Defendant Freight Bulk was and now is a business entity organized and existing under the laws of a foreign country.

7.     Vista and Freight Bulk are the beneficial and registered owners, respectively, of the M/V CAPE VIEWER. The M/V CAPE VIEWER is now within the District of Virginia and has been attached pursuant to the order of maritime attachment obtained by Flame in 13 CV 00658.[1]

8.     Prior to its purported Bankruptcy, and in the face of creditor claims in excess of $100 million, Industrial Carriers, Sergei and Victor Baranskiy, knowingly and intentionally,

---

[1] Flame has obtained an order of maritime attachment with respect to the M/V Cape Viewer that is defective for lack of subject matter jurisdiction. To the extent that Flame relies upon its English Judgment against Industrial Carriers, the English Judgment was not and could not have been entered by an English Admiralty Court. To the extent that Flame relies upon the Southern District of New York's judgment against Industrial Carriers recognizing the English Judgment, the Southern District of New York Judgment is void for lack of subject matter jurisdiction. Glory Wealth will shortly be filing a motion to reopen that case as an interested party and move to vacate Flame's void judgment pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.

fraudulently and unlawfully, transferred Industrial Carriers' business, assets, operations, personnel, contacts, know-how, good will, ongoing charters and business relationships and other valuable property from Industrial Carriers to its fraudulently and wrongfully established affiliates, subsidiaries and connected entities, including but not limited to Defendants Vista and Freight Bulk. Defendants Vista and Freight Bulk therefore maintain their wrongful existence and assets at the expense of Industrial Carriers's just creditors and are therefore alter-ego's, successors-in-interest and fraudulent transferees with respect to Industrial Carriers.

9.  Glory Wealth is one of Industrial Carriers's creditors.  It maintains a maritime claim against Industrial Carriers for breach of a charter party.  Actions arising from breach of charter parties indisputably fall within this Court's admiralty subject matter jurisdiction.

10.  As set forth in greater detail below, Glory Wealth has pursued its claim against Industrial Carriers in arbitration in London, pursuant to the terms of the relevant charter party, and has obtained a duly rendered award against Industrial Carriers in the amount of $38,528,759.18, plus interest (the "**Award**").  A true and correct copy of the Award is attached as Exhibit 1 to the accompanying Affidavit of James H. Power dated December 17, 2013 ("**Power Affidavit**").

11.  As alter-egos and/or successors-in-interest and/or fraudulent transferees with respect to Industrial Carriers, Defendants Vista and Freight Bulk are liable to Glory Wealth.

12.  Glory Wealth respectfully seeks an order of maritime attachment as against the property of Vista and Freight Bulk in this judicial district, *to wit*, the M/V CAPE VIEWER and any freight or hire payable to Vista and/or Freight Bulk from currently unknown entities within

this district in connection with the M/V CAPE VIEWER's carriage of coal from this judicial

district to an unknown location.

### GLORY WEALTH'S CLAIM AGAINST INDUSTRIAL CARRIERS

13.     On or about June 5, 2008, Industrial Carriers time chartered from Glory

Wealth the vessel M/V MINERAL CAPEASIA for a period of 12-13 months via fixture recap

pursuant to the New York Produce Exchange Form with Rider Clauses (collectively the

**"Charter"**).

14.     Glory Wealth, as owner, and Industrial, as charterer, entered into a time charter

agreement.

15.     Under the terms of the Charter, the daily charter hire rate required to be paid by

Industrial Carriers to Glory Wealth was $183,000 per day payable 15 days in advance.  Industrial

Carriers failed to pay the 4th installment of hire which became due on 17 August 2008, or any

other payment due under the Charter, while simultaneously placing Glory Wealth in the

untenable position of being forced to perform the voyages or be liable to the relevant cargo

owners and sub-charterers.

16.     Glory Wealth commenced arbitration in London pursuant to clause 45 of the

Charter.  Industrial Carriers failed to respond to the duly served arbitration demands or appoint

an arbitrator despite multiple requests from Glory Wealth and the arbitrator to do so.  Under the

circumstances, the London Arbitration Panel determined to resolve the matter with Industrial

Carriers in *absentia*, and issued the lengthy and reasoned Award, dated October 29, 2009.

17.    The Award sets forth the particulars of Glory Wealth's claim, the nature of its damages, and the legal bases for the arbitrators' decision in considerable detail.   The Award grants Glory Wealth its claim for outstanding hire in the amount of $3,715,482.18, with interest compounded quarterly from October 2008 at the rate of 4.75%, and $34,813,271.00 in damages, with interest compounded quarterly from March, 2009 at the rate of 4.75%.

18.    With respect to the unpaid hire interest has accrued to $1,011,709.82.   With respect to the damages, interest has accrued to $6,842,309.91.   As such, Industrial Carriers is currently liable to Glory Wealth in the amount of $46,382,772.91.

## GLORY WEALTH'S CLAIMS AGAINST SERGEI BARANSKIY, VICTOR BARANSKIY, VISTA AND FREIGHT BULK

19.    Sergei and Victor Baranskiy, are and were majority shareholders of Industrial Carriers.   They exerted complete control over the entity and its finances, including bank accounts.   Sergei Baranskiy owned 51% of Industrial Carriers, while Victor Baranskiy was the beneficial owner of 18% of Industrial Carriers.

20.    Victor Baranskiy has admitted that ICI, with knowledge by Sergei Baranskiy and Victor Baranskiy, utilized shell corporations to divert assets of Industrial Carriers to avoid attachments of Industrial Carriers' assets.

21.    As a result of Industrial Carriers' practice of fraudulently diverting payments and contracts to its subsidiaries, Industrial Carriers was severely undercapitalized relative to its obligations.

22.    Industrial Carriers filed for bankruptcy shortly after it entered the Charter with Glory Wealth, evincing a fraudulent intent to collect charter and/or freight hire from its customers while failing to pay Glory Wealth.

23.    The entities within the "Industrial Carriers Group" including but not limited to Defendants routinely disregard corporate form and do not deal with the other members of the group absent an arm's-length relationship. The Defendants possess, transfer and/or hold funds of, or for the benefit of, one another, and make and receive payments for, and on behalf of, the other Defendants, pooling the resources without regard to corporate separateness, and without entering into an arm's-length negotiated contract to provide such services.

24.    As set forth in the BDO Report, which is attached in this consolidated action to the Affidavit of William Bennett, approximately $57 million was wrongfully transferred out of the Industrial Carriers Bankruptcy Estate.

25.    Vista was formed by the very persons at ICI who orchestrated, effectuated, knew of and allowed the Industrial Carriers fraud and who directly benefited from such fraud. The assets of Vista and Freight Bulk are simply the former assets of Industrial Carriers, and to wit, the $57 million which was wrongfully transferred out of the Industrial Carriers Bankruptcy Estate.

26.    Victor Baranskiy has represented that he is the beneficial owner and sole managerial authority with respect to Vista and Freight Bulk. Victor Baranskiy owns 100% of the shares of Vista, and 100% of the shares of the entity which owns Freight Bulk.

27.    Vista and Freight Bulk are defendants in this action because they are the ultimate direct and beneficial recipients of the fraudulent transfers from Industrial Carriers that were

made during and immediately prior to Industrial Carriers' (now dismissed) bankruptcy. While not necessary to pierce the corporate veil of both Defendants as they are recipients of fraudulent proceeds, the Vessel represents the fruit of the Industrial Carriers' bankruptcy fraud. Vista, Freight Bulk, and Industrial Carriers' common ownership, management, business continuity and affiliation are relevant to the issues of motive and ability to perpetrate the fraud in question, as well as "disregard" of the corporate form and "mere continuation" of Industrial Carriers' business.

28.     On June 24, 2008, Vista was incorporated in the British Virgin Islands to receive fraudulent asset transfers from Industrial Carriers. Industrial Carriers wrongfully utilized its subsidiaries, including Defendants to create a sophisticated web of shell companies by which to divert, and then re-divert cash and receivables that should have been within the Industrial Carriers estate for the benefit of its myriad creditors, including Glory Wealth. The receivables, cash, contracts, know how, relationships and assets were ultimately diverted to Vista and Freight Bulk's benefit and use, and ultimately utilized to purchase the M/V CAPE VIEWER without bank financing and without a mortgage. Ultimately, all of the wrongful diversions of assets of Industrial Carriers were fraudulent as to Glory Wealth. Accordingly, it is equitable and justified pursuant to the venerable body of United States maritime law, to pierce the corporate veil of all of the beneficiaries of these transfers, particularly Defendants, and hold these alter-egos liable for Industrial Carriers's debts.

29.     Victor Baranskiy, without any support, claims that Vista was initially capitalized with approximately $1 million in *cash in a suitcase* provided to him by his mother. Even if this were true, which is denied, funds provided to Victor Baranskiy were nonetheless themselves

funds obtained directly and/or indirectly from the fraudulent diversion of funds from ICI by Sergei Baranskiy and Victor Baranskiy.

30.     Even more fantastically, Victor Baranskiy claims that within a period of approximately 24-36 months, he converted this $1 million investment into more than $100 million, such that the Vessel, along with approximately 10 other vessels, could be purchased in cash *without* mortgages.

31.     Rather, Sergei Baranskiy and Victor Baranskiy conspired to utilize their ownership, position and influence at Industrial Carriers and to convert and siphon the missing $57 million from Industrial Carriers into the unmortgaged "Vista" fleet, utilizing Vista, Freight Bulk and related entities and affiliates owned and nominally controlled by Victor Baranskiy as the vehicles of their fraud.

32.     Victor Baranskiy interchangeably utilizes Vista and Vista's affiliates that Victor Baranskiy has admitted he solely owns and controls, including but not limited to Freight Bulk. For example, in connection with successive charter hire payments associated with the M/V Great Dynasty, Columbus Maritime Corp. a Victor Baranskiy company, made a payment of $52,348.63 on November 21, 2012, while Vista made a $52,348.63 payment in connection with the same charter on January 11, 2013.

33.     Viktor Baranskiy further admits to taking the former employees, profitable contract and chartering routes he established at Industrial Carriers and misappropriating them for Defendants' benefit. This act alone renders Vista a fraudulent transferee and justifies piercing of the corporate veil.

34.     The Defendants have common ownership and managerial control and employees. Defendants Industrial Carriers, Vista, and Freight Bulk are commonly controlled, beneficially owned and managed by Viktor Baranskiy, Vladimir Yudaev, Michael Ivanov, Vladimir Ivanov and Daniel Su. Viktor Baranskiy, in particular, is a shareholder, director and/or managerial employee - or has some other ability to control - every corporate Defendant. Viktor Baranskiy directly or indirectly owns the Defendants, in whole or in part, and ultimately exercises complete dominion and control over all the Defendants, whether or not he owns a controlling share in any particular Defendant.

35.     Defendants are not found within the Eastern District of Virginia but do have assets, goods or chattels within the jurisdiction, to wit: the vessel CAPE VIEWER and receivables in connection with the CAPE VIEWER'S Carriage of coal.

**WHEREFORE**, Glory Wealth Shipping Pte Ltd., prays:

1.     That a order of maritime attachment and garnishment may issue against the Defendants; and if Defendants cannot be found, then that their goods, chattels and credits within the district, and particularly the vessel CAPE VIEWER and receivables in connection with the CAPE VIEWER'S Carriage of coal may be attached in an amount sufficient to answer Glory Wealth's claim;

2.     That Defendants, and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

3.     That judgment be entered in favor of Glory Wealth Shipping Pte Ltd. against Defendants in the amount of $46,382,772.91; and,

4.     That this Court grant Glory Wealth Shipping Pte Ltd. such other and further relief

which it may deem just and proper.

Dated: New York, New York
       January 9, 2013

                              BY:   Holland & Knight LLP


                                    __/s/_____
                                    Michelle Hess (VSB# 71080)
                                    James H. Power (Admitted *Pro Hac Vice*)
                                    31 West 52nd Street
                                    New York, NY 10019
                                    212-513-3200
                                    212-385-9010 (facsimile)
                                    michelle.hess@hklaw.com
                                    james.power@hklaw.com

                                    *Attorneys for Intervening Plaintiff*
                                    *Glory Wealth Shipping Pte Ltd.*

## VERIFICATION

STATE OF NEW YORK      )

                           :ss.:

COUNTY OF NEW YORK     )

James H. Power, being duly sworn, deposes and says:

I am an attorney with the firm of Holland & Knight LLP, counsel for Glory Wealth Shipping Pte Ltd. ("Glory Wealth"), plaintiff in the foregoing action. I have read the foregoing Verified Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by Glory Wealth and my firm has corresponded with Glory Wealth's representatives regarding this matter. I am authorized by Glory Wealth to make this verification, and the reason for my making it as opposed to an officer or director of Glory Wealth is that there are none within the jurisdiction of this Honorable Court.

_____

James H. Power

Sworn to before me this
9th Day of January, 2014

_____

Notary Public

Elvin Ramos
Notary Public State of New York
NO. C1RA4870243
Qualified in Queens County
Certificate filed in New York County
Commission Expires September 2, 2014

#27009109_v1

11

## CERTIFICATE OF SERVICE

I certify that on the 9th day of January, 2014, a true copy of the foregoing was filed via the Court's electronic case filing (ECF) system and serve via electronic mail on counsel of record:

Steven Stancliff
Crenshaw Ware & Martin PLC
150 West Main Street
Suite 1500
Norfolk, VA 23510
Sstancliff@cwm.law.com

Lauren Brooke Wilgus
William Robert Bennett III
Blank Rome LLP
405 Lexington Avenue
The Chrysler Building
New York, New York 10174
lwilgus@blankrome.com
wbennett@blankrome.com
*Counsel for Plaintiffs Flame S.A.*

Patrick Brogan
Davey & Brogan PC
101 Granby Street
Suite 300
Norfolk VA 23510
pbrogan@daveybrogan.com

George Chalos
Chalos & Co. P.C.
55 Hamilton Avenue
Oyster Bay, NY 11771
gmc@chaloslaw.com
*Counsel for Defendants*

/s/
Michelle T. Hess (VSB#71080)
HOLLAND & KNIGHT LLP

31 West 52nd Street,
New York, NY 10019
(212) 513-3583
(212) 385-9010 (facsimile)
michelle.hess@hklaw.com

*Attorneys for Consolidated Plaintiff*
*Glory Wealth Shipping Pte Ltd.*

# EXHIBIT 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FLAME S.A.,

                    Plaintiff,

GLORY WEALTH SHIPPING PTE LTD.          Civil Action No: 2:13cv658-RGD-LRL
                                                       2:13cv704-RGD-LRL
                    Consolidated Plaintiff,

              -against-

INDUSTRIAL CARRIERS, INC., et al.,

                    Defendants.

### DECLARATION OF JAMES H. POWER IN SUPPORT OF CONSOLIDATED PLAINTIFF GLORY WEALTH SHIPPING PTE LTD.'S NOTICE OF JOINDER IN PLAINTIFF FLAME S.A.'S MOTION TO COMPEL

Pursuant to 28 U.S.C. § 1746 and under penalty of perjury, JAMES H. POWER declares as follows:

1.      I am a Partner with the firm of Holland & Knight LLP, attorneys for Consolidated Plaintiff Glory Wealth Shipping Pte Ltd ("**Glory Wealth**"), and I have been admitted *pro hac vice* to the Eastern District of Virginia for the purposes of this action.

2.      This declaration is executed by the undersigned in support of Glory Wealth's Notice of Joinder in Plaintiff Flame S.A.'s ("**Flame**") Motion to Compel. Glory Wealth will offer an expert report and present its designated forensic expert to testify at trial about the transactions detailed herein. I offer this declaration solely in support of the motion at hand and by necessity considering the incredibly short discovery schedule and the need to resolve the current discovery dispute.

3.      I am fully familiar with the facts and circumstances underlying this dispute.

4.      I make this declaration for the primary purpose of rebutting two principal assertions of Freight Bulk Pte Ltd ("**Freight Bulk**") in connection with the discovery dispute before this Court.

5.      First Freight Bulk incorrectly asserts that Glory Wealth does not have evidence supporting the facts as set forth in the alter ego, fraudulent transfer and successor in interest allegations in Glory Wealth's Amended Complaint.  As such, Freight Bulk argues, discovery should not proceed because the Glory Wealth's complaint should be dismissed.

6.      Second, Freight Bulk argues that the records of entities other than Freight Bulk, Freight Bulk's agents and affiliates and, Mr. Viktor Baranskyi specifically, have under their control, are not germane to this lawsuit.  As such, these entities should not be compelled to provide the requested discovery.

7.      Both of Freight Bulk's premises are simply untrue.

8.      Glory Wealth has amassed voluminous evidence supporting each and every one of the alter ego, fraudulent transfer and successor in interest allegations from third party sources as well as pursuant to subpoenas issued in Glory Wealth's New York litigation.

9.      Freight Bulk's fundamental defense in this action is that Viktor Baranskyi and the companies he controlled and controls, i.e. Vista and the individual ship owning entities, were capable of buying approximately a dozen vessels for cash, without mortgages, based upon the success of Viktor Baranskyi's chartering business through Vista.  Evaluation of this defense necessitates and requires production of the Vista and affiliated entity financial documents that support it.  The need for such discovery is all the more heightened given that Glory Wealth has already obtained wire transfer records with respect to Vista and Baranskyi's vessel owning entities that fundamentally contradict Freight Bulk's defense.

2

## THE WIRE TRANSFER DISCOVERY

10.     On or about February 26, 2014, in connection with a New York Supreme Court action[1], Glory Wealth served Subpoenas Duces Tecum on nine New York located banks[2] for third-party records related to bank transactions conducted by the Defendants and bank transactions referencing vessels known or believed to be owned or beneficially owned by the Defendants.  Notice of the subpoenas was provided to each of the defendants in the New York action.  At the time the subpoenas were served on the third parties in the New York action counsel for Freight Bulk confirmed he was not authorized to accept service in the New York action nor was counsel authorized to act for Freight Bulk in New York.  Despite having received notice of both the subpoenas and the Complaint none of the defendants have appeared in the New York action.

11.     I have been retained by numerous other clients in similar situations to enforce judgments, engage in asset discovery and recovery and pursue fraud and fraudulent conveyances against international shipping companies.  I have in prior cases determined that there are third party sources capable of producing information similar to what might be expected from a defendant's financial institution, but the records are maintained in the U.S. rather than an unreachable foreign jurisdiction.

12.     All U.S. Dollar denominated wire transfers clear through so-called intermediary banks in New York, including but not limited to Bank of China, BNP Paribas, Commerzbank AG, Deutsche Bank, HSBC Bank USA, N.A., JP Morgan Chase Bank, Standard Chartered Bank, UBS Bank and UniCredit Bank AG ("**Intermediary Banks**").

---

[1] *Glory Wealth Shipping Pte Ltd v. Industrial Carriers, Inc., et al.*, Index No. 650590-2014 (N.Y.Sup.)
[2] Subpoenas Duces Tecum were served on Bank of China, BNP Paribas, Commerzbank AG, Deutsche Bank, HSBC Bank USA, N.A., JP Morgan Chase Bank, Standard Chartered Bank, UBS Bank and UniCredit Bank AG.

13.     In my experience, the Intermediary Banks maintain records of the wire transfers they process for a minimum of 6-8 years. As such, it is possible to recreate the financial history of virtually any entity that does business in U.S. Dollars. In this case, Glory Wealth has obtained records of thousands of wire transfers totaling in excess of several hundred of million dollars with respect to not only defendants Industrial Carriers Inc. ("**Industrial Carriers**"), Freight Bulk Pte Ltd. ("**Freight Bulk**"), and Vista Shipping Ltd. ("**Vista**"), but many of the other conduits and entities utilized by Sergei and Viktor Baranskyi to wrongfully transfer a minimum tens of millions of U.S. dollars from the Industrial Carriers estate to related and wholly controlled shell companies mostly incorporated in the Marshall Islands and BVI.

14.     At a basic and fundamental level, I believe the records demonstrate, transfer by transfer, how Sergei and Victor Baranskiy fraudulently and unlawfully diverted Industrial Carriers' receivables, in the minimum amount of $40-60 million, to sham entities such as Weaver Investments Inc. ("**Weaver**"), ITIRO Corporation ("**ITIRO**"), Blue Coast Navigation S.A. ("**Blue Coast**"), Selene Shipmanagement S.A. ("**Selene**"), Auster Marine Co. ("**Auster**") and Diamant Co. Ltd. ("**Diamant**") (collectively the "**Fraudulent Conduits**").[3]

15.     Most, if not all of the original Industrial Carriers and Fraudulent Conduits maintained bank accounts at HSBC in Greece. Industrial Carriers also maintained a side account at Regionala Insteicju Banka (a/k/a Regional Investment Bank JSC or "**RIB Latvia**"), SWIFT RIBRLV22, in Riga, Latvia. The wire transfer records suggest that the funds sent by third parties at the instruction of Industrial carriers to its account at RIB Latvia were made available to Vista, various single purpose vessel owning entities, Sea Traffic Shipping Co. and ultimately

---

[3] Follow up subpoenas concerning Treselle Navigation, Tempest Service Inc. and Cardinia Management Co. were just recently served.

4

Freight Bulk.  All of the Baranskyi owned and controlled successor companies also opened and maintained at all relevant times accounts at RIB Latvia including Vista and Sea Traffic.

16.     Vista was incorporated on June 24, 2008 in the BVI.  The wire transfer records support the conclusion that Vista was originally just another paper company set up by Sergei Baranskyi and his son Viktor Baranskyi to collect payments owed to Industrial Carriers from third parties.  Upon incorporation in the BVI, Vista opened two bank accounts: one at Banque Heritage, S.A. in Geneva, Switzerland and another at RIB Latvia.

17.     I believe the records demonstrate that the $40-60 million wrongfully diverted to Weaver, ITIRO, Blue Coast, Selene, Auster and Diamant were never returned to the Industrial Carriers' estate.  In fact, according to the BDO report, Industrial Carriers failed to declare the funds in the accounts of these entities even though in the months leading up to the voluntary bankruptcy filing by Industrial Carriers in Greece, Weaver alone received more than $25 million dollars due and owing to Industrial Carriers.  Weaver even received post-bankruptcy payment of $425,503.49 on November 20, 2008 from third party Cobelfret S.A. for hire due on the vessel M/V Lioness C (IMO 8115007) pursuant to charter party dated August 27, 2008.

18.     The wire transfers document a pattern of significant charter payments from third party Fayette International Holdings Ltd. ("**Fayette**") to Industrial Carriers' RIB Latvia account in early 2008 ($251,863.13 on January 25, 2008; $2,000,000 on February 1, 2008 and $1,892,651.17 on February 4, 2008).

19.     Then, in mid-2008 Fayette began making payments to Weaver (including payments of $4,086,000.18 on August 6, 2008; $938,768.67 on August 11, 2008; $1,034,356.10 on August 22, 2008; $5,463,757.15 on August 28, 2008; $1,490,761.34 on September 17, 2008 and $3,740,532.04 on September 22, 2008).  At the instruction of Industrial Carriers, Fayette

5

similarly made payments to related entity Auster even though these funds were due and owing to Industrial Carriers. On September 17, 2008, Fayette paid $128,806.62 to Auster.

20.     After the bankruptcy filing of Industrial Carriers and after it became widely known that both Weaver and Auster were paying agents of Industrial Carriers, Fayette began to pay Vista and other entities that appear to have been set up by Sergei and Viktor to collect significant sums due to Industrial Carriers by Fayette on existing contracts. On October 27, 2008 Fayette paid Vista $2,766,305.71, transferring such funds into Vista's Banque Heritage account in Geneva.

21.     The records further demonstrate that vessel owning entities owned and controlled by Sergei and Viktor Baranskyi, all of which share addresses and/or registered agents with Vista, purchased the vessels Viktor Baranskyi admitted in his deposition to purchasing for cash, without a mortgage.  These include Maritime Services Company Ltd., company no. 37699 (**"Maritime Services"**) and Sea Breeze Navigation Inc., company no. 37698 (**"Sea Breeze"**) which according to Viktor Baranskyi purchased the first two vessels, M/V V EUROPE (IMO 8009442) and M/V V AUSTRALIA (IMO 8008785), respectively.

22.     According to Viktor Baranskyi he purchased the M/V V EUROPE and the M/V V Australia (ex M/V Princess Marisol) in cash from funds Vista received from chartering ships. The Baranskyi owned entity which purchased the M/V V EUROPE was Maritime Services, a Marshall Islands company formed on October 26, 2009 and dissolved on October 24, 2011. Maritime Services maintained an account at RIB Latvia and the estimated purchase price of the M/V V Europe was $12,000,000.00-$15,000,000.00. The Baranskyi owned entity that purchased the M/V V AUSTALIA in cash was Sea Breeze, a Marshall Islands company formed on October 26, 2009 and dissolved on October 24, 2011. The M/V V AUSTRALIA was purchased for

6

$14,200,000.00 on or about April 22, 2010 from Lowrie Shipping LLC pursuant to a Memorandum of Agreement (MOA) dated 17 February 2010. The original MOA had Vista as the purchaser but Sea Breeze was substituted as nominee purchaser. The purchase was made from funds in the RIB Latvia account of Sea Breeze.

23.    With respect to the purchase of the M/V V AUSTRALIA, a deposit of $2,700,000.00 was made on February 23, 2010 by Sea Breeze. The final payment of $11,500,000.00 was made on February 22, 2010. The M/V V AUSTRALIA was sold by Baranskyi on or about August to September 2011 to Best Oasis Ltd, a vessel scrapper. A payment of $2,841,605.00 was made by Best Oasis Ltd to Sea Breeze's RIB Latvia account on August 9, 2011. The balance of the purchase price is believed to have been paid to an entity other than Sea Breeze.

24.    According to the testimony of Viktor Baranskyi, the profits he earned from Vista from October 27, 2008 to February 23, 2010 were enough to purchase the vessels M/V V EUROPE and M/V V AUSTRALIA in cash without a mortgage. However, my review of the wire transfers has revealed insufficient payments to Vista's Banque Heritage or RIB Latvia accounts during this period. In addition, I have seen no evidence from my review of the wire transfers that Vista made any payments to either Maritime Services or Sea Breeze. Thus, from the face of the wire transactions Maritime Services and Sea Breeze obtained the necessary purchase funds of approximately $28,000,000.00 via the RIB Latvia account of a Baranskyi controlled entity to the RIB Latvia account of Sea Breeze. The funds did not come from any obvious and open transfer by Vista to any of these vessel owning entities.

25.    Unlike the alleged loan transaction between Baranskyi owned Sea Traffic and Freight Bulk for $18,500,000.00, a similar Sea Traffic loan was not possible in the case of the

M/V V EUROPE and the M/V V AUSTRALIA as Sea Traffic was not formed as a Marshal Islands company until June 3, 2010 after the purchase of these two initial vessels. There is no plausible explanation as to how Sea Breeze obtained the funds to make this purchase. Viktor Baranskyi vaguely testified that he began Vista in June of 2008 with approximately $1 million loaned from his mother and investments and other loans worth a few hundred thousand dollars. The wire transfer evidence suggests Vista did no substantial business before October 2008 and rather was simply created to follow Weaver in collecting payments owed to Industrial Carriers from Fayette. The more plausible explanation is that Vista morphed into an ongoing chartering concern only after it began collecting funds originally due to Industrial Carriers.

26.    The wire transfers reveal a series of vessel purchases and sales beginning in February 2010 and continuing through February 2014 with the recent sales of the vessel M/V DON MAX to Best Oasis Ltd on or about February 11, 2014 reflected by a 25% deposit payment from Best Oasis Ltd to Sea Traffic in the amount of $420,226.00. The funds used to purchase the vessels and the funds used for the sale of the vessels all appear to have been comingled between numerous Baranskyi owned entities.

27.    It appears from the wire transfers and other information from maritime industry sources that another vessel purchased by Viktor Baranskyi was the M/V FATHER S (IMO 8406377)(ex ATA), which Viktor Baranskyi admitted was named after Sergei Baranskyi, his father. The M/V FATHER S was purchased by Saiwai Maru Shipping Co., company no. 41576 ("Saiwai"), on or about November 24, 2010. Saiwai was incorporated in the Marshall Islands on June 10, 2010. On October 19, 2010, from its RIB Latvia account, Saiwai made the initial deposit of $1,212,500.00 for the M/V FATHER S pursuant to an MOA dated September 30,

2010.  On November 24, 2010 Saiwai paid $11,091,548.25 from its RIB Latvia account for the balance of the purchase price.

28.     Saiwai has also made payments as indicated by the wire transfers relating to other vessels including the M/V V KERKIS.  On April 18, 2011 Saiwai paid $150,000 to Dobson Fleet Management for "Payment balance for 2010 for vessel V Kerkis for SOA."

29.     The M/V FATHER S is believed to have been sold in February 2014 to a vessel scrap buyer based in Singapore.   On February 4, 2014 the Singapore scrap buyer paid $3,458,694.00 to Sea Traffic for the initial deposit pursuant to the MOA dated January 30, 2014. As Sea Traffic was incorporated only in June of 2010 and it had no apparent source of income, it is utterly implausible that Sea Traffic funded the purchase of the M/V FATHER S pursuant to a loan agreement similar to that between Sea Traffic and Freight Bulk.  The approximately $12.4 million which was used by Saiwai arrived in Saiwai's account via an RIB Latvia intra bank transfer.  However, the sale proceeds of the M/V FATHER S were directed to Sea Traffic for no apparent consideration.  The Sea Traffic transfers indicate that Sea Traffic's primary function is to pay crew wages for vessels controlled by Baranskyi and collect, commingle and re-distribute vessel sale proceeds received from the sale of Baranskyi fleet vessels.

30.     Sale proceeds from other vessels in the Baranskyi fleet were directed to Sea Traffic.  On November 19, 2013, Warkabell Limited paid Sea Traffic $717,980.00 for the 80% of the purchase price of the M/V PRIMA pursuant to an MOA dated November 1, 2013.

31.     Grimsel Shipping S.A. paid Sea Traffic $279,000.00 towards the purchase of the M/V MARINA (IMO 8230247) on September 16, 2013.  The M/V MARINA is owned by the Marshall Islands single purpose entity Moon Shadow Marine Co.

9

32.    In July, Best Oasis Ltd paid Sea Traffic $420,000 representing 25% of the purchase price for the M/V DON MAX (IMO 9043158). The M/V DON MAX is owned by the single ship Marshall Islands entity Marine Traveler Co., company no. 45361 ("**Marine Traveler**") formed on January 19, 2011.

33.    On January 6, 2014, Sea Traffic received a payment of $8,549,680.41 into its RIB Latvia account representing the balance of the purchase price of the M/V V KERKIS (IMO 8029064). The M/V V KERKIS was owned by the Marshall Islands single shipowning entity Costa Palma Navigation Inc. formed on February 18, 2010 prior to the formation of Sea Traffic.

34.    On January 10, 2014, Sea Traffic rather than Saiwai received a payment in the amount of $7,251,820.58 representing the balance for the purchase of a vessel M/V FATHER S pursuant to an MOA dated November 12, 2013.

35.    The proceeds from the sales of vessels purchased from funds transferred to various Baranskyi owned single purpose entities prior to the incorporation of Sea Traffic demonstrate that the funds purportedly loaned by Sea Traffic to Freight Bulk for the purchase of the M/V CAPE VIEWER and the M/V CAPE CLIMBER were not Sea Traffic funds but funds directly obtained from proceeds used in purchasing the M/V V EUROPE and the M/V V AUSTRALIA.

36.    Moon Shadow Marine Co. company no. 41577 ("**Moon Shadow**"), (Sawai Maru Shipping Co. ("**Saiwai**"), Alba Navigare Co. ("**Alba**"), Serena Sea Navigation Co., company no, 45363 ("**Serena**"), Shine Crystal Navigation Co. ("**Shine**"), Sea Star Shipholding Ltd. ("**Sea Star**"), Sea Star Holding Ltd., company no. 50434 ("**Sea Star Holding**"), Atlantic Marine Division Corp. ("**Atlantic Marine**"), Mystique Voyager Shipping, company no. 45366 ("**Mystique**"), Sea Life Navigation Co. ("**Sea Life**"), Fairland Enterprises Ltd. ("**Fairland**") and

numerous other single purpose shipowning companies mysteriously obtained tens of millions of dollars shortly after their formation, and beginning approximately 12-18 months after the wrongful diversion of tens of millions of dollars of Industrial Carriers receivables to the Fraudulent Conduits.

37.     In short, the allegation is that the vessel purchase funds, including but not limited to the M/V CAPE VIEWER, are directly traceable to the fraudulently transferred Industrial Carriers funds which are alleged to have been directed by Sergei and Viktor Baranskyi to Industrial Carriers' RIB Latvia account for further use by subsequent Baranskyi owned entities with accounts at RIB Latvia and those Industrial funds directed to Weaver at HSBC Bank PLC Greece.  The allegation of wrongfully diverted Industrial Carriers funds is supported by hard evidence in the form of thousands of wire transfers and the allegations that Freight Bulk is the direct beneficiary of ill-gotten gains, fraudulent conveyances and comingled funds of, or owed to, Industrial Carriers is also supported by the wire transfer evidence.

38.     Alba Navigare Co. ("**Alba**") was formed in the Marshall Islands on June 2, 2011. On October 14, 2011 Alba made an initial deposit of $1,220,000.00 from its RIB Latvia account for the M/V MELBOURNE (IMO 8517982).  On October 19, 2011, Alba made a payment of $11,550,000.00 from its RIB Latvia account for the balance of the purchase price.

39.     On or about July 25, 2011, Serena Sea Navigation Co. ("**Serena**") purchased the M/V PHOENIX from Force Peace International Ltd.  On June 22, 2011 Serena made a payment of $1,627,500.00 for the initial deposit per the MOA dated June 20, 2011.  On July 25, 2011, Serena made another payment of $9,887,778.00 for the remainder of the purchase price.  In addition, Serena purchased the motor tug SIRIUS pursuant to an MOA dated January 4, 2012.

40.     As part of Glory Wealth's discovery request to Freight Bulk and Viktor Baranski and Vista we requested documents reflecting transfers from Industrial Carriers RIB Latvia account or Weaver's HSBC account to any of the Baranskyi controlled entities including, but not limited to Vista. In the meantime we intend to pursue Regionala Insteicju Banka's correspondent bank which will further evidence the transfers from Weaver, ITIRO, Blue Coast, Selene, Auster and Diamant to Sea Breeze, Alba, Selene and other Barnaskiy intermediaries including via the Hague Convention. However, the current discovery schedule will not allow for the records to be produced via the Hague Convention in time for trial.

41.     In turn, it is now uncontroverted that Sea Traffic made the purported loan, to Freight Bulk to buy the M/V CAPE VIEWER, which is currently under attachment. Freight Bulk never made a repayment on that purported loan until February 18, 2014 when Freight Bulk paid Sea Traffic $39,138.42 referencing "LOAN PAYMENT AS PER AGREEMENT NO. 35/11 DD 09/08/12." A review of the wire transfer evidence makes clear that Freight Bulk was kept insolvent since January 2013 by Viktor Baranskyi. Although the vessels M/V CAPE VIEWER and M/V CAPE CLIMBER were chartered to Vista, no hire payments were made by Vista to Freight Bulk. As such, without any other source of income Freight Bulk could never pay nor be expected to pay back any loan to Sea Traffic. This evidence alone should overcome any allegation by Freight Bulk that a prima facie alter ego case has not been set forth by Glory Wealth.

42.     I believe the records further demonstrate how, beginning with the vessels M/V V EUROPE and M/V V AUSTRALIA, Viktor Baranskyi utilized Vista, Sea Breeze, Maritime Services and then Sea Traffic, to implement a strategy of laundering the wrongfully diverted Industrial Carriers money to purchase a series of vessels, including the M/V CAPE VIEWER

12

and M/V CAPE CLIMBER and most recently the M/V CAPE TORONTO (IMO 9157612) and the M/V CAPE CLIPPER (IMO 9121326) pursuant to a MOA dated December 5, 2013 and addendum dated December 16, 2013. These vessels were purchased by funds transferred from Sea Traffic. $13,300,000.00 was transferred by Sea Traffic to Singapore attorneys Holman Fenwick Willan LLP for the M/V CAPE TORONTO. Sea Traffic made two recent transfers for the purchase of the M/V CAPE CLIPPER. One transfer was for $1,420,000.00 to attorneys Mayer Brown LLP and $13,216,676.60 reflecting the balance of the purchase price was transferred by Sea Traffic shortly thereafter.

43.     The records further demonstrate that vessel owning entities owned and controlled by Viktor Baranskyi, all of which share addresses and/or registered agents with Vista, such as Sea Breeze Navigation Inc. ("**Sea Breeze**"), Sawai Maru Shipping Co. ("**Saiwai**"), Alba Navigare Co. ("**Alba**"), Serena Sea Navigation Co., company no. 45363 ("**Serena**"), Sea Star Shipholding Ltd. ("**Sea Star Shipholding**"), Sea Star Holding Limited ("**Sea Star Holding**") and Atlantic Marine Division Corp. ("**Atlantic Marine**") never paid back any loans to Vista or Sea Traffic. Rather, Sea Traffic simply received the money on the subsequent vessel sale.

44.     Based on my review of the wire transfer records, there are only two vessels which were directly funded by Vista. To the extent Vista claims it funded the purchase of the M/V CAPE VIEWER and M/V CAPE CLIMBER and all prior vessels, Vista needs to produce additional evidence to contradict the wire transfers. Funding of vessel purchases directly by Vista did not occur until more than three years after Viktor Baranskyi claims Vista funded the purchase of vessels from Vista's operating profits beginning in early 2010. In late 2013, Vista transferred $6,000,000.00 to Marshall Islands entity Timber Finance Ltd. (formed on April 30, 2013) from its RIB Latvia account representing a 30% deposit for the vessels M/V CAPE

13

KESTREL (IMO 9036014) and M/V GRAF (IMO 9105645).    Shortly thereafter, Vista transferred $7,618,452.67 from its RIB Latvia account to Timber Finance Ltd. believed to represent the final payment for the purchase of the M/V GRAFF per the contract dated October 10, 2013.  Vista also transferred $9,332,665.12 from its RIB Latvia account to Timber Finance Ltd. for the balance of the purchase price for the M/V CAPE KESTREL pursuant to contract dated October 10, 2013.

## DISCOVERY AS TO VISTA AND ALL THE VESSEL OWNING ENTITIES AND MANAGERS IS REQUIRED

45.    Meanwhile, the records demonstrate that despite chartering out these vessels (and receiving income for the same) Vista never paid charter hire to the entities that owned the vessels.  As such, Vista was provided "free" vessels purchased with wrongfully diverted funds to charter to third parties.

46.    Furthermore, as the forthcoming analysis[4] of Vista's financial and chartering activity will most likely demonstrate that Vista and Viktor Baranskyi could not have obtained sufficient funds to purchase the subject vessels without mortgages, including but not limited to the M/V CAPE VIEWER, via ordinary chartering activity.  Rather, Vista was provided with "free" vessels to charter out to paying customers.  These Baranskyi fleet vessels are alleged to have been purchased with the fraudulently transferred Industrial Carriers receivables that were diverted to Industrial Carriers RIB Latvia account and to Weaver and others.

47.    In sum, I believe the wire transfers will unequivocally demonstrate the impossibility of Viktor Baranskyi's unsubstantiated and fanciful contention that he turned "a

---

[4] The first, interim, expert report of Michael Brown, of Marcum LLP, which report will provide an initial forensic analysis of all of the wire transfers obtained, is forthcoming.

million dollars in a suitcase" from his mother into more than $100 million of un-mortgaged vessels via Vista's "lawful" chartering activity alone. Instead, all of the vessels operated and chartered by Vista, including the M/V CAPE VIEWER, were more likely purchased with and are directly traceable to the Industrial Carriers fraud, evidenced by the wire transfers.

48.    Indeed, it is apparent from the wire transfers that Vista was most likely initially just another sham entity through which Sergei and Viktor Baranskyi wrongfully transferred or had others transfer Industrial Carriers' assets including receivables from existing clients of Industrial Carriers.

49.    A basic summary of the aggregate wire transfer production is below:

| Bank | Companies | Range of Dates | Approximate Number of Transactions |
|------|-----------|----------------|-----------------------|
| JP Morgan | Alba Navigare | 10/14/2011 - 10/24/2011 | 3 |
| | Auster Marine | 1/24/2008 - 5/4/2009 | 40 |
| | Black Sea Service | 5/28/2013 | 1 |
| | Columbus Maritime Shipping | 11/16/2011 - 3/12/2014 | 730 |
| | Diamant Co. | 1/12/2006 - 4/4/2013 | 93 |
| | Freight Bulk Pte | 10/12/2012 - 12/17/2012 | 3 |
| | Industrial Carriers | 1/9/2006 - 2/14/2011 | 811 |
| | ITIRO Corporation | 3/28/2008 - 3/12/2014 | 1328 |
| | Saiwai Maru Shipping | 10/19/2010 - 4/18/2011 | 4 |
| | Sea Breeze Navigation | 2/23/2010 - 10/6/2011 | 15 |
| | Sea Traffic Shipping | 8/17/2010 - 2/14/2014 | 6753 |
| | Selene Shipmanagement | 9/27/2006 - 4/24/2008 | 79 |
| | Serena Sea Navigation | 6/22/2011 - 12/13/2012 | 6 |

| | | | |
|---|---|---|---|
| | Tech Project LLC | 1/5/2012 | 1 |
| | Vista Shipping Inc | 8/6/2012 - 1/9/2014 | 46 |
| | Weaver Investment | 9/7/2007 - 9/22/2008 | 30 |
| Deutsche Bank | Columbus Maritime Shipping | 10/7/2011 - 3/3/2014 | 515 |
| | Diamant Co Ltd | 3/5/07 - 11/12/2008 | 351 |
| | Freight Bulk Pte Ltd | 12/30/2013 - 2/20/2014 | 3 |
| | Industrial Carriers | 3/5/2007 - 3/30/2010 | 370 |
| | Sea Traffic Shipping | 9/24/2010 - 3/3/2014 | 2569 |
| | Vista Shipping Inc | 11/24/2008 - 2/28/2014 | 566 |
| Bank of China | Industrial Carriers | 2/9/2007 - 9/15/2008 | 73 |
| | ITIRO Corporation | 6/0/2009 - 2/28/2014 | 111 |
| | Selene Shipmanagement | 3/13/2008 - 4/10/2008 | 5 |
| | Vista Shipping | 1/6/2009 - 2/19/2014 | 164 |
| BNP Paribas | Auster Marine | 10/15/2008 - 10/17/2008 | |
| | Black Sea Service | 12/11/2007 - 12/17/2007 | |
| | Columbus Maritime Shipping | 12/21/2011 - 3/3/2014 | |
| | Diamant Co Ltd | 8/8/2007 - 9/18/2008 | |
| | Freight Bulk Pte Ltd | 2/18/2014 | |
| | Industrial Carriers | 7/20/2007 - 9/22/2008 | |
| | ITIRO Corporation | 3/31/2008 - 1/28/2014 | |
| | Sea Traffic Shipping | 4/15/2013 - 2/18/2014 | |
| | Selene Shipmanagement | 6/30/2008 | |
| | Vista | 10/27/2008 - 2/28/2014 | |
| | Weaver | 9/26/2007 - 7/15/2009 | |

| | Columbus Maritime Shipping | 4/27/2012 - 12/30/2013 | 15 |
|---|---|---|---|
| | Diamant | 1/25/2006 - 3/3/2008 | 5 |
| | Freight Bulk | 12/20/2013 - 12/30/2013 | 2 |
| | Industrial Carriers | 5/18/2006 - 10/20/2008 | 190 |
| | Sea Breeze Navigation | 7/16/2010 | 1 |
| | Sea Traffic Shipping Co | 3/4/2011 - 2/18/2014 | 111 |
| | Selene Shipmanagement | 11/1/2006 - 4/10/2008 | 7 |
| | Vista Shipping | 6/23/2010 - 2/19/2014 | 194 |
| | Weaver Investments | 2/15/2007 - 8/20/2008 | 23 |

50.    I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief based on the information I have reviewed.

Dated: New York, New York
       April _8_, 2014

_____
James H. Power

17

# EXHIBIT 4

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | | |
|---|---|---|
| Flame S.A., | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| Glory Wealth Shipping Pte Ltd., | ) | |
| | ) | |
| Consolidated Plaintiff | ) | Civil Action Nos. 2:13-cv-658-RGD-LRL |
| | ) | 2:13-cv-704-RGD-LRL |
| v. | ) | |
| | ) | |
| Industrial Carriers, Inc., | ) | |
| Vista Shipping, Inc., and | ) | |
| Freight Bulk Pte Ltd., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS IN A CIVIL ACTION

To:     Holland & Knight LLP
        Attn: Subpoena Compliance
        31 West 52nd St.
        New York, NY 10019

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: **see attached Schedule A.**

| Place:     Mayer Brown LLP<br>1675 Broadway<br>New York, NY 10019-5820 | Date and Time: May 1, 2014 at 9:30 a.m. |
|---|---|

☐ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: _____ The deposition will be recorded by stenographic and audiovisual means.

| Place: | |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  April 16, 2014

| *CLERK OF COURT* | OR | |
|---|---|---|
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing **Freight Bulk Pte Ltd.**, who issues or requests this subpoena, are:

ADAM L. HUDES
MAYER BROWN LLP
1999 K STREET, N.W.
WASHINGTON, D.C. 20006-1101
(202) 263-3298
ahudes@mayerbrown.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action Nos. 2:13-cv-658-RGD-LRL and 2:13-cv-704-RGD-LRL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45)*

I received this subpoena for (*name of individual and title, if any*) _____

on (*date*) _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____ ; or

☐ I returned the subpoena unexecuted because _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 _____.

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(a) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## SCHEDULE A

**DEFINITIONS**

    1.    The terms "action" and "litigation" shall mean the lawsuits, filed in the United States District Court for the Eastern District of Virginia, Case Nos. 2:13-cv-658-RGD-LRL and 2:13-cv-704-RGD-LRL.

    2.    The term "all" shall mean "each," "every," and "any."

    3.    The terms "communication," "communications," "communicating," and "correspondence" refer to any oral, written, or symbolic expression or interchange of any type, and include but is not limited to a letter, memorandum, facsimile transmission, facsimile cover page, teletype, telegraph, telephone conversation, telephone message, telephone log, telephone record, electronic mail message, voicemail message, or any and all "cc" or "bcc" copies of any of the above.

    4.    The terms "document" and "documents" are used in the broadest sense allowed by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—and include, but are not limited to, any communications, writings, drawings, graphs, charts, photographs, records, tape recordings, notes diaries, calendars, checkbooks, books, papers, accounts, electronic or videotape recordings, telephone records, telephone logs, internal or external websites, compact discs, computer files and disks, social media accounts, and electronically stored information.

    5.    The terms "electronically stored information" and "ESI" are used in the broadest sense permitted by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—and include all information stored, written, or read on any electronic system including, but not limited to, internal or external websites; compact discs; computer files and/or disks; electronic mail; text messages; voice mails; Skype or other video conferencing service communications; instant

messages; social media profiles and postings; facsimiles; instant messages; mobile phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented, or damaged data; and anything stored on a computer, computer server, or other electronic means located on or in, but not limited to, cache memory, optical disks, magnetic tapes/back-up tapes, magnetic disks (hard drives, floppy disks, etc.), PDAs, smart phones, USB drives, and cloud storage.

6.    The term "New York Litigation" shall mean the action titled *Glory Wealth Shipping Pte Ltd. v. Industrial Carriers, Inc., et al.*, Index No. 650590/2014 (N.Y. Sup. Ct.).

7.    The term "Power Declaration" shall refer to the Declaration of James H. Power in Support of Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.'s Notice of Joinder in Plaintiff Flame S.A.'s Motion to Compel filed on April 9, 2014 in the action.

8.    As used herein, "related to," "relating to," "relate to," "related," and "regarding" shall mean analyzing, containing, concerning, dealing with, constituting, defining, describing, discussing, embodying, evidencing, explaining, identifying, mentioning, reflecting, referring to, setting forth, showing, stating, summarizing, supporting, or in any way pertaining to the subject matter of the relevant Request.

9.    The terms "you" and "your" refer to Holland & Knight LLP, and any divisions, departments, domestic and foreign subsidiaries, branches, parents, affiliates, predecessors in interest, present and former officers, directors, managers, employees, agents, servants, experts, attorneys, and representatives.

**INSTRUCTIONS**

1.    Unless the context of a particular request indicates otherwise, the relevant time period to which each request refers is January 1, 2012 to present.

2. The past tense form shall be construed to include the present tense, and vice versa, whenever such a dual construction will serve to bring within the scope of a request any response that would otherwise not be within its scope.

3. Each category of documents in these requests extends to any and all documents in your possession, custody, or control. Such documents shall include, but are not limited to, documents that are in the custody of any of your associates, partners, counsel, or any other attorneys; Glory Wealth Shipping Pte Ltd. ("Glory Wealth"); vendors; representatives; or other agents.

4. All requests for production below shall be construed to include any additional documents responsive to these requests that are discovered or produced after the date of production.

5. All documents should be produced in the order in which they appear in your files, organized by source, and should contain a clear indication of where each document ends and the next begins. Documents maintained in a file folder or binder should be preceded by the file folder or binder label, if one exists, and should contain a clear indication of where the file folder or binder begins and ends. All attachments to a document should be produced with the document. A unique control number should be affixed to each page.

6. With respect to ESI:

a. All electronic mail, HTML and dynamic files (including, but not limited to spreadsheets and databases) responsive to these requests that are maintained in the usual course of business in electronic format shall be produced in their native format along with the software necessary to interpret such files if such software is not readily available.

3

b.     All other documents responsive to these requests that are maintained in the usual course of business in electronic format shall be produced in properly unitized, single-page TIFF Group IV format complete with full text extracts and all associated metadata.

c.     All documents responsive to these requests shall be produced with the metadata normally contained within such documents. If such metadata is not available, each document shall be accompanied by a listing of all file properties concerning such document, including, but not limited to, all information concerning the date(s) the document was last accessed, created, modified or distributed, and the author(s) and recipient(s) of the document.

d.     Under no circumstances should ESI be converted from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome to use the ESI. ESI should not be produced in a form that removes or significantly degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means. Databases or underlying data should not be produced without first discussing production format issues with the Plaintiffs' counsel. If you decline to search or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden or cost you claim is associated with the search or production of such ESI.

7.     If you object to the production of any document or tangible thing within the scope of the requests below, you must fully set forth your objections in writing, provide a list of all

4

such documents and tangible things being withheld, and state the following for each such document or tangible thing: (i) the designated document number, if any; (ii) the type of document, *e.g.*, letter or memorandum; (iii) the general subject matter of the document; (iv) the date of the document; (v) the location and custodian of the document; and (vi) the author of the document, the addressee of the document, any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

8.    If any document that you are requested to produce or identify herein was at one time in existence, but has been lost, discarded, or destroyed, identify in writing each document and provide the following information: (a) the date or approximate date it was lost, discarded, or destroyed; (b) the circumstances and manner in which it was lost, discarded, or destroyed; (c) the reason or reasons for disposing of the document (if discarded or destroyed); (d) the identity of all persons authorizing the document and/or having knowledge of the document; (e) the identity of the persons who lost, discarded, or destroyed the document; (f) the identity of any persons having knowledge of the contents thereof; and (g) a detailed summary of the nature and contents of the document, including the author(s) of the document(s), the name of the person(s) to whom the document(s) was (were) delivered or addressed, including indicated or blind copy recipients, the date of the document(s), and a description of the subject matter thereof, including any attachment or appendices, and the number of pages.

9.    If you object in whole or in part to any request based on a claim of privilege, provide a list of the documents being withheld and for each such document: (a) state the nature of the privilege which is being claimed and the law governing the privilege rule that is being invoked and (b) provide a description of the document, including (i) the designated document number, if any; (ii) the type of document, *e.g.*, letter or memorandum; (iii) the general subject

matter of the document; (iv) the date of the document; (v) the location and custodian of the document; and (vi) the author of the document, the addressee of the document, any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

10.    If any of the documents requested below cannot be produced in full, you are requested to produce them to the fullest extent possible, specifying clearly the reasons for your inability to produce the remainder and stating any information, knowledge, or belief you have concerning the unproduced portion.

11.    The specificity of any request below shall not be construed to limit the generality or reach of any other request herein.

## REQUESTED DOCUMENTS

1.    All documents and correspondence provided to, considered by, reviewed by, edited by, or created by Mr. James H. Power in relation to the Power Declaration, including but not limited to any prior drafts and communications regarding drafts.

2.    All documents constituting or reflecting any correspondence with any subpoena respondent or their counsel in connection with any subpoena issued in the New York Litigation that were relied upon or considered by Mr. James H. Power when drafting, reviewing, or editing the Power Declaration.

3.    All documents relied upon or that otherwise form the bases for the assertions in the Power Declaration, including but not limited to any documents referenced in the declaration.

4.    All documents or drafts related to the Power Declaration, that were generated by Mr. Warren E. Gluck, Ms. Marie E. Larsen, Ms. Michelle Hess, or any other attorney or

paraprofessional at Holland & Knight LLP assigned to this action or the New York Litigation, including but not limited to any documents referenced in the Power Declaration.

5.      All wire transfer records or documents regarding wire transfers identified, referenced in, or relied upon in the Power Declaration, including but not limited to all transfers to, from, and within Regionala Insteicju Banka (a/k/a Regional Investment Bank JSC or RIB Latvia).

6.      All communications between Mr. James H. Power and Michael Brown of Marcum LLP relating to the Power Declaration or any wire transfer, SWIFT transfer, intra-bank transfer, or inter-bank transfer identified, referenced in, or relied upon in the Power Declaration.

# EXHIBIT 5

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Virginia

| | | |
|---|---|---|
| **Flame S.A.,** | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| **Glory Wealth Shipping Pte Ltd.,** | ) | |
| | ) | |
| Consolidated Plaintiff | ) | Civil Action Nos. 2:13-cv-658-RGD-LRL |
| | ) | 2:13-cv-704-RGD-LRL |
| v. | ) | |
| | ) | |
| **Industrial Carriers, Inc.,** | ) | |
| **Vista Shipping, Inc., and** | ) | |
| **Freight Bulk Pte Ltd.,** | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## SUBPOENA TO PRODUCE DOCUMENTS AND TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:    James H. Power, Esq.
        Holland & Knight LLP
        31 West 52nd Street
        New York, NY 10019

☒ *Production*: **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material: **see attached Schedule A.**

| Place:   Mayer Brown LLP<br>1675 Broadway<br>New York, NY 10019-5820 | Date and Time: May 1, 2014 at 9:30 a.m. |
|---|---|

☒ *Testimony*: **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment: **see attached Schedule B.** The deposition will be recorded by stenographic and audiovisual means.

| Place: Mayer Brown LLP<br>1675 Broadway<br>New York, NY 10019-5820 | Date and Time: May 6, 2014 at 9:30 a.m. |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  April 16, 2014

*CLERK OF COURT*            OR

_____       _____
*Signature of Clerk or Deputy Clerk*           *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing **Freight Bulk Pte Ltd..**, who issues or requests this subpoena, are:

ADAM L. HUDES
MAYER BROWN LLP
1999 K STREET, N.W.
WASHINGTON, D.C. 20006-1101
(202) 263-3298
ahudes@mayerbrown.com

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action Nos. 2:13-cv-658-RGD-LRL and 2:13-cv-704-RGD-LRL

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45)*

This subpoena for (*name of individual and title, if any*) _____

was received by me on (*date*) _____.

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on (*date*) _____; or

☐ I returned the subpoena unexecuted because _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of $ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $  0.00  _____.

I declare under penalty of perjury that this information is true.

Date: _____                      _____

                                                                        *Server's signature*

                                                                  _____

                                                                        *Printed name and title*

                                                                  _____

                                                                        *Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

*(1) For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
(A) within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
(B) within the state where the person resides, is employed, or regularly transacts business in person, if the person
(i) is a party or a party's officer; or
(ii) is commanded to attend a trial and would not incur substantial expense.

*(2) For Other Discovery.* A subpoena may command:
(A) production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
(B) inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

*(1) Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

*(2) Command to Produce Materials or Permit Inspection.*
*(A) Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
*(B) Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
(i) At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

*(3) Quashing or Modifying a Subpoena.*
*(A) When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
(i) fails to allow a reasonable time to comply;
(ii) requires a person to comply beyond the geographical limits specified in Rule 45(c);
(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
(iv) subjects a person to undue burden.
*(B) When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
(i) disclosing a trade secret or other confidential research, development, or commercial information; or

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
*(C) Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
(ii) ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

*(1) Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
*(A) Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
*(B) Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
*(C) Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
*(D) Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

*(2) Claiming Privilege or Protection.*
*(A) Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
(i) expressly make the claim; and
(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
*(B) Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## DEFINITIONS

1.      The terms "action" and "litigation" shall mean the lawsuits, filed in the United States District Court for the Eastern District of Virginia, Case Nos. 2:13-cv-658-RGD-LRL and 2:13-cv-704-RGD-LRL.

2.      The term "all" shall mean "each," "every," and "any."

3.      The terms "communication," "communications," "communicating," and "correspondence" refer to any oral, written, or symbolic expression or interchange of any type, and include but is not limited to a letter, memorandum, facsimile transmission, facsimile cover page, teletype, telegraph, telephone conversation, telephone message, telephone log, telephone record, electronic mail message, voicemail message, or any and all "cc" or "bcc" copies of any of the above.

4.      Unless otherwise specified, the term "complaint" shall mean the amended complaint filed by Glory Wealth Shipping Pte Ltd. ("Glory Wealth") on January 9, 2014.

5.      The terms "document" and "documents" are used in the broadest sense allowed by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—and include, but are not limited to, any communications, writings, drawings, graphs, charts, photographs, records, tape recordings, notes diaries, calendars, checkbooks, books, papers, accounts, electronic or videotape recordings, telephone records, telephone logs, internal or external websites, compact discs, computer files and disks, social media accounts, and electronically stored information.

6.      The terms "electronically stored information" and "ESI" are used in the broadest sense permitted by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—and include all information stored, written, or read on any electronic system including, but not limited to,

internal or external websites; compact discs; computer files and/or disks; electronic mail; text messages; voice mails; Skype or other video conferencing service communications; instant messages; social media profiles and postings; facsimiles; instant messages; mobile phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e., Access); erased, fragmented, or damaged data; and anything stored on a computer, computer server, or other electronic means located on or in, but not limited to, cache memory, optical disks, magnetic tapes/back-up tapes, magnetic disks (hard drives, floppy disks, etc.), PDAs, smart phones, USB drives, and cloud storage.

7.  The term "New York Litigation" shall mean the action titled *Glory Wealth Shipping Pte Ltd. v. Industrial Carriers, Inc., et al.*, Index No. 650590/2014 (N.Y. Sup. Ct.).

8.  The term "Power Declaration" shall refer to the Declaration of James H. Power in Support of Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.'s Notice of Joinder in Plaintiff Flame S.A.'s Motion to Compel filed on April 9, 2014 in the action.

9.  As used herein, "related to," "relating to," "relate to," "related," "and "regarding" shall mean analyzing, containing, concerning, dealing with, constituting, defining, describing, discussing, embodying, evidencing, explaining, identifying, mentioning, reflecting, referring to, setting forth, showing, stating, summarizing, supporting, or in any way pertaining to the subject matter of the relevant Request.

10.  The terms "you" and "your" refer to James H. Power, Esq.

## INSTRUCTIONS

1.  Unless the context of a particular request indicates otherwise, the relevant time period to which each request refers is January 1, 2012 to present.

2

2.     The past tense form shall be construed to include the present tense, and vice versa, whenever such a dual construction will serve to bring within the scope of a request any response that would otherwise not be within its scope.

3.     Each category of documents in these requests extends to any and all documents in your possession, custody, or control.  Such documents shall include, but are not limited to, documents that are in the custody of any of your associates, partners, counsel, or any other attorneys; Glory Wealth Shipping Pte Ltd. ("Glory Wealth"); vendors; representatives; or other agents.

4.     All requests for production below shall be construed to include any additional documents responsive to these requests that are discovered or produced after the date of production.

5.     All documents should be produced in the order in which they appear in your files, organized by source, and should contain a clear indication of where each document ends and the next begins.  Documents maintained in a file folder or binder should be preceded by the file folder or binder label, if one exists, and should contain a clear indication of where the file folder or binder begins and ends.  All attachments to a document should be produced with the document.  A unique control number should be affixed to each page.

6.     With respect to ESI:

a.     All electronic mail, HTML and dynamic files (including, but not limited to spreadsheets and databases) responsive to these requests that are maintained in the usual course of business in electronic format shall be produced in their native format along with the software necessary to interpret such files if such software is not readily available.

3

b.     All other documents responsive to these requests that are maintained in the usual course of business in electronic format shall be produced in properly unitized, single-page TIFF Group IV format complete with full text extracts and all associated metadata.

c.     All documents responsive to these requests shall be produced with the metadata normally contained within such documents. If such metadata is not available, each document shall be accompanied by a listing of all file properties concerning such document, including, but not limited to, all information concerning the date(s) the document was last accessed, created, modified or distributed, and the author(s) and recipient(s) of the document.

d.     Under no circumstances should ESI be converted from the form in which it is ordinarily maintained to a different form that makes it more difficult or burdensome to use the ESI. ESI should not be produced in a form that removes or significantly degrades the ability to search the ESI by electronic means where the ESI is ordinarily maintained in a way that makes it searchable by electronic means. Databases or underlying data should not be produced without first discussing production format issues with the Plaintiffs' counsel. If you decline to search or produce ESI on the ground that such ESI is not reasonably accessible because of undue burden or cost, identify such information by category or source and provide detailed information regarding the burden or cost you claim is associated with the search or production of such ESI.

7.     If you object to the production of any document or tangible thing within the scope of the requests below, you must fully set forth your objections in writing, provide a list of all

such documents and tangible things being withheld, and state the following for each such document or tangible thing: (i) the designated document number, if any; (ii) the type of document, *e.g.*, letter or memorandum; (iii) the general subject matter of the document; (iv) the date of the document; (v) the location and custodian of the document; and (vi) the author of the document, the addressee of the document, any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

8.     If any document that you are requested to produce or identify herein was at one time in existence, but has been lost, discarded, or destroyed, identify in writing each document and provide the following information: (a) the date or approximate date it was lost, discarded, or destroyed; (b) the circumstances and manner in which it was lost, discarded, or destroyed; (c) the reason or reasons for disposing of the document (if discarded or destroyed); (d) the identity of all persons authorizing the document and/or having knowledge of the document; (e) the identity of the persons who lost, discarded, or destroyed the document; (f) the identity of any persons having knowledge of the contents thereof; and (g) a detailed summary of the nature and contents of the document, including the author(s) of the document(s), the name of the person(s) to whom the document(s) was (were) delivered or addressed, including indicated or blind copy recipients, the date of the document(s), and a description of the subject matter thereof, including any attachment or appendices, and the number of pages.

9.     If you object in whole or in part to any request based on a claim of privilege, provide a list of the documents being withheld and for each such document: (a) state the nature of the privilege which is being claimed and the law governing the privilege rule that is being invoked and (b) provide a description of the document, including (i) the designated document number, if any; (ii) the type of document, *e.g.*, letter or memorandum; (iii) the general subject

matter of the document; (iv) the date of the document; (v) the location and custodian of the document; and (vi) the author of the document, the addressee of the document, any other recipients shown in the document, and, where not apparent, the relationship of the author, addressees, and recipients to each other.

10.    If any of the documents requested below cannot be produced in full, you are requested to produce them to the fullest extent possible, specifying clearly the reasons for your inability to produce the remainder and stating any information, knowledge, or belief you have concerning the unproduced portion.

11.    The specificity of any request below shall not be construed to limit the generality or reach of any other request herein.

**REQUESTED DOCUMENTS**

1.    All documents and correspondence provided to, considered by, reviewed by, edited by, or created by you in relation to the Power Declaration, including but not limited to any prior drafts and communications regarding drafts.

2.    All documents constituting or related to any correspondence with any subpoena respondent or their counsel in connection with any subpoena issued in the New York Litigation that you relied upon or considered when drafting, reviewing, or editing the Power Declaration.

3.    All documents relied upon, related to, or that otherwise form the bases for, the assertions in the Power Declaration, including but not limited to any documents referenced in the declaration.

4.    All documents or drafts related to the Power Declaration, that were generated by Mr. Warren E. Gluck, Ms. Marie E. Larsen, Ms. Michelle Hess, or any other attorney or

paraprofessional at Holland & Knight LLP assigned to this action or the New York Litigation, including but not limited to any documents referenced in the Power Declaration.

6.     All documents and correspondence provided to you or Holland & Knight LLP in order to verify Glory Wealth's Verified Complaint and Amended Verified Complaint in the action.

5.     All wire transfer records or documents related to wire transfers identified, referenced in, or relied upon in the Power Declaration, including but not limited to all transfers to, from, and within Regionala Insteicju Banka (a/k/a Regional Investment Bank JSC or RIB Latvia).

6.     All communications between you and Michael Brown of Marcum LLP realted to the Power Declaration or any wire transfer, SWIFT transfer, intra-bank transfer, or inter-bank transfer identified, referenced in, or relied upon in the Power Declaration.

7.     All documents and drafts of documents created, drafted, generated, reviewed, or edited by Michael Brown of Marcum LLP that you identified, referenced in, or relied upon in the Power Declaration.

8.     All documents and communications related to or otherwise forming the factual and legal basis of your belief that: "At a basic and fundamental level, I believe the records demonstrate, transfer by transfer, how Sergei and Victor Baranskiy fraudulently and unlawfully diverted Industrial Carrier's receivables, in the minimum amount of $40-60 million[.]"

9.     All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "The wire transfer records suggest that the funds sent by third parties at the instruction of Industrial [C]arriers to its account at RIB Latvia were made

7

available to Vista, various single purpose vessel owning entities, Sea Traffic Shipping Co. and ultimately Freight Bulk."

10. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: other entities "appear to have been set up by Sergei and Viktor [Baranskiy] to collect significant sums due to Industrial Carriers by Fayette on existing contacts."

11. All documents and communications related to your "review of the wire transfers."

12. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[t]here is no plausible explanation as to how Sea Breeze obtained the funds to make [the] purchase" of the M/V V Europe and the M/V V Australia.

13. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[t]he wire transfer evidence suggests Vista did not do substantial business before October 2008 and rather was simply created to follow Weaver in collecting payments owed to Industrial Carriers from Fayette."

14. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[t]he more plausible explanation is that Vista morphed into an ongoing chartering concern only after it began collecting funds originally due to Industrial Carriers."

15. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "it is utterly implausible that Sea Traffic funded the purchase of the M/V Father S pursuant to a loan agreement[.]"

16. All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "The proceeds from the sales of vessels purchased from

funds transferred to various Baranskiy owned single purpose entities prior to the incorporation of Sea Traffic demonstrate that the funds purportedly loaned by Sea Traffic to Freight Bulk for the purchase of the M/V CAPE VIEWER and the M/V CAPE CLIMBER were not Sea Traffic funds but funds directly obtained from proceeds used in purchasing the M/V V EUROPE and the M/V V AUSTRALIA."

17.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[i]n short, the allegation is that the vessel purchase funds, including but not limited to the M/V CAPE VIEWER, are directly traceable to the fraudulently transferred Industrial Carriers funds which are alleged to have been directed by Sergei and Viktor Baranskiy to Industrial Carriers' RIB Latvia account for further use by subsequent Baranskiy owned entities with accounts at RIB Latvia and those Industrial [Carriers] funds directed to Weaver at HSBC Bank PLC Greece."

18.    All document and communications related to or otherwise forming the factual and legal basis of your statement that: "[t]his evidence alone should overcome any allegation by Freight Bulk that a prima facie alter ego case has not been set forth b Glory Wealth."

19.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "I believe the records further demonstrate how, beginning with the vessels M/V V EUROPE and M/V V AUSTRALIA, Viktor Baranskiy utilized Vista, Sea Breeze, Maritime Services and then Sea Traffic, to implement a strategy of laundering the wrongfully diverted Industrial Carriers money to purchase a series of vessels, including the M/V CAPE VIEWER[.]"

20.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[b]ased on my review of the wire transfer records, there are only two vessels which were directly funded by Vista."

21.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "Vista needs to produce additional evidence to contradict the wire transfers."

22.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "as the forthcoming analysis of Vista's financial and chartering activity will most likely demonstrate that Vista and Viktor Baranskiy could not have obtained sufficient funds to purchase the subject vessels without mortgages, including but not limited to the M/V CAPE VIEWER, via ordinary chartering activity."

23.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "[i]n sum, I believe the wire transfers will unequivocally demonstrate the impossibility of Viktor Baranskyi's [sic] unsubstantiated and fanciful contention that he turned 'a million dollars in a suitcase' from his mother into more than $100 million of un-mortgaged vessels via Vista's 'lawful' chartering activity alone," including but not limited to the source of the quote "a million dollars in a suitcase."

24.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "Instead, all of the vessels operated and chartered by Vista, including the M/V CAPE VIEWER, were more likely purchased with and are directly traceable to the Industrial Carriers fraud, evidenced by the wire transfers."

25.    All documents and communications related to or otherwise forming the factual and legal basis of your statement that: "it is apparent from the wire transfers that Vista was most

likely just another sham entity through which Sergei and Viktor Baranskyi [*sic*] wrongfully transferred or had others transfer Industrial Carriers' assets including receivables from existing clients of Industrial Carriers."

## SCHEDULE B

## DEFINITIONS AND INSTRUCTIONS

1. "The terms "action" and "litigation" shall mean the above-captioned lawsuits, filed in the United States District Court for the Eastern District of Virginia, Case Nos. 2:13-cv-658-RGD-LRL and 2:13-cv-704-RGD-LRL.

2. The terms "communication," "communications," "communicating," and "correspondence" refer to any oral, written, or symbolic expression or interchange of any type, and include but is not limited to a letter, memorandum, facsimile transmission, facsimile cover page, teletype, telegraph, telephone conversation, telephone message, telephone log, telephone record, electronic mail message, voicemail message, or any and all "cc" or "bcc" copies of any of the above.

3. The terms "document" and "documents" are used in the broadest sense allowed by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—an include, but are not limited to, any communications, writings, drawings, graphs, charts, photographs, records, tape recordings, notes, diaries, calendars, checkbooks, books, papers, accounts, electronic or videotape recordings, telephone records, telephone logs, internal or external websites, compact discs, computer files and disks, social media accounts, and electronically stored information.

4. The terms "electronically stored information" and "ESI" are used in the broadest sense permitted by Rules 45 and 34(a) of the Federal Rules of Civil Procedure—and includes all information stored, written, or read on any electronic system including, but not limited to, internal or external websites; compact discs; computer files and/or disks; electronic mail; text messages; voice mails; Skype or other video conferencing service communications; instant messages; social media profiles and postings; facsimiles; instant messages; mobile phone data; Excel spreadsheets and underlying formulae; metadata; computer databases (i.e.,

1

Access); erased, fragmented, or damaged data; and anything stored on a computer, computer server, or other electronic means located on or in, but not limited to, cache memory, optical disks, magnetic tapes/back-up tapes, magnetic disks (hard drives, floppy disks, etc.), PDAs, smart phones, USB drives, and cloud storage.

5.  The term "New York Litigation" shall mean the action titled *Glory Wealth Shipping Pte Ltd. v. Industrial Carriers, Inc., et al.*, Index No. 650590/2014 (N.Y. Sup. Ct.).

6.  The term "Power Declaration" shall refer to the Declaration of James H. Power in Support of Consolidated Plaintiff Glory Wealth Shipping Pte Ltd.'s Notice of Joinder in Plaintiff Flame S.A.'s Motion to Compel filed on April 9, 2014 in the action.

7.  As used herein, "related to," "relating to," "relate to," "related," and "regarding" shall mean analyzing, containing, concerning, dealing with, constituting, defining, describing, discussing, embodying, evidencing, explaining, identifying, mentioning, reflecting, referring to, setting forth, showing, stating, summarizing, supporting, or in any way pertaining to the subject matter of the relevant Request.

8.  The relevant time period for the Topics below is January 1, 2008 to the present.

9.  The terms "you" and "your" refer to James H. Power, Esq.

## TOPICS FOR EXAMINATION

1.  The factual and evidentiary basis for all statements made in the Power Declaration.

2.  All communications between you and Glory Wealth Shipping Pte Ltd. ("Glory Wealth"), including the officers, directors, employees, agents, scheme administrator of Glory Wealth, or any employee, officer, director, or agent of Deloitte & Touch Financial Advisory Services Pte Ltd. or its parents, subsidiaries, or affiliates regarding the Power Declaration, any documents

or information relied upon when drafting or editing the Power Declaration, or any information relied upon when verifying Glory Wealth's Verified Complaint in this Litigation.

3. The subpoenas referenced in the Power Declaration, including but not limited to any correspondence with any subpoena respondent or their counsel in connection with any subpoena issued in the New York Litigation that you relied upon or considered when drafting, reviewing, or editing the Power Declaration.

4. Documents related to the Power Declaration, including but not limited to prior drafts of the Power Declaration and any memoranda or correspondence you or attorneys working under your direction relied upon to draft the Power Declaration.

5. Documents and drafts of documents created, drafted, generated, reviewed, or edited by Michael Brown of Marcum LLP that you identified, referenced in, or relied upon in the Power Declaration.

6. The documents or correspondence you relied upon in order to verify Glory Wealth's amended verified complaint and verified complaint in this action.

7. Your policies, practices, and customs related to the collection, identification, preservation, retention, and production of documents.

8. Your specific policies, practices, and customs for this litigation concerning the collection, identification, preservation, retention, and production of documents.

9. The identity of all persons with knowledge of the topics in this Subpoena.

10. The location of documents within your possession, custody, or control relating to the topics in this Subpoena, and accessibility of those documents.

# EXHIBIT 6

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

FLAME S.A.,

Plaintiff,

GLORY WEALTH SHIPPING PTE LTD.

Consolidated Plaintiff,

-against-

INDUSTRIAL CARRIERS, INC., et al.,

Defendants.

Civil Action No: 2:13cv658-RGD-LRL
2:13cv704-RGD-LRL

## RESPONSES AND OBJECTIONS OF HOLLAND & KNIGHT LLP AND JAMES H. POWER TO SUBPOENAS FOR PRODUCTION OF DOCUMENTS AND TESTIMONY

Non-parties Holland & Knight LLP ("Holland & Knight") and James H. Power ("Power") hereby separately object and respond to (a) the Subpoena to Produce Documents issued to Holland & Knight (the "HK Subpoena") and (b) the Subpoena to Produce Documents and Testify at a Deposition to James H. Power (the "Power Subpoena") (together "the Subpoenas") as follows:

### GENERAL OBJECTIONS

1.      Holland & Knight and Power object to the Subpoenas to the extent they seek to impose obligations and duties or seek documents or testimony that are different or beyond those required by law, including those obligations set forth in the Federal Rules of Civil Procedure, the Local Rules of this Court, or the Local Rules of the United States District Court for the Southern District of New York.

2. Holland & Knight and Power object to the Subpoenas to the extent they seek documents and testimony which are neither relevant to any issue in this action nor calculated to lead to the discovery of admissible evidence.

3. Holland & Knight and Power object to the Subpoenas to the extent they have been served solely to harass and to interfere with Holland & Knight and Power's representations of a client interested in the action.

4. Holland & Knight and Power object to the Subpoenas to the extent they seek documents and testimony protected by the attorney-client or other privileges, the work-product doctrine, duties of confidentiality, or information contained in said documents and testimony that is otherwise privileged, protected or confidential, pursuant to any applicable doctrine, statute or rule. Such responses as may hereafter be given shall not include any information or documents protected by such privileges, doctrines, agreements, statutes or rules, and inadvertent disclosures of such information shall not deemed a waiver of any such privilege, protection, or confidentiality.

5. Holland & Knight and Power object to the Subpoenas to the extent they are duplicative of requests served on Holland & Knight's client, Glory Wealth Shipping Pte Ltd. ("Glory Wealth"), and therefore impose an undue and unnecessary burden and expense on non-parties Holland & Knight and Power, who are counsel to Glory Wealth. There is simply no basis for propounding identical requests to counsel for a party in the circumstances at bar. To the extent that the Requests below overlap with those made to Glory Wealth, and are not otherwise objectionable, Glory Wealth will produce responsive documents in accordance with the provisions of Rule 34 of the Federal Rules of Civil Procedure.

6.     Holland & Knight and Power object to the Power Subpoena as seeking testimony from a current party's attorney, which is protected from disclosure by the attorney-client privilege and work product doctrine.   Mr. Power has not been identified as an expert in this matter and is not offering expert testimony.   Mr. Power's Declaration dated April 9, 2014 (the "Power Declaration"), which is the basis for the vast majority of topics for examination noted in the deposition subpoena, was presented to the Court in response to motions filed by Freight Bulk, to demonstrate that they mischaracterized the amount of evidence Glory Wealth has to support its claims.

7.     Holland & Knight and Power hereby incorporate all objections and responses made by Glory Wealth to document requests and deposition notices served on it in this litigation and all such objections and responses are preserved.

## OBJECTIONS TO SPECIFIC REQUESTS IN THE H&K SUBPOENA FOR PRODUCTION OF DOCUMENTS

1.     In addition to the General Objections, Holland & Knight objects to Request No. 1 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine.   Holland & Knight also objects as this Request duplicates Request No. 31 to Glory Wealth.

2.     In addition to the General Objections, Holland & Knight objects to Request No. 2 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine.   Holland & Knight also objects as this Request duplicates Request Nos. 29, 32, and 33 to Glory Wealth.

3.     In addition to the General Objections, Holland & Knight objects to Request No. 3 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine.   Holland & Knight also objects as this Request

duplicates Request No. 33 to Glory Wealth and overlaps significantly with Request Nos. 27, 29, 31, and 33.

4. In addition to the General Objections, Holland & Knight objects to Request No. 4 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Any such drafts and documents are clearly protected from disclosure by Rule 26 of the Federal Rules of Civil Procedure.

5. In addition to the General Objections, Holland & Knight objects to Request No. 5 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Holland & Knight also objects as this Request duplicates Request No. 34 to Glory Wealth and overlaps significantly with Request Nos. 27, 29, 31, 32, and 33 to Glory Wealth.

6. In addition to the General Objections, Holland & Knight objects to Request No. 6 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth and to the extent it is duplicative of documents and information, not otherwise objectionable, that Glory Wealth shall disclose pursuant to Rule 26(a)(2). In communicating with Michael Brown, Mr. Power is acting on behalf of Glory Wealth, and all such communications, to the extent not protected from disclosure by the work product doctrine, will be produced in accordance with Glory Wealth's discovery responses.

## OBJECTIONS TO DOCUMENTS REQUESTED BY POWER SUBPOENA

1. In addition to the General Objections, Power objects to Request No. 1 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects as this Request duplicates Request No. 31 to Glory Wealth.

2. In addition to the General Objections, Power objects to Request No. 2 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects as this Request duplicates Request No. 32 to Glory Wealth.

3. In addition to the General Objections, Power objects to Request No. 3 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects as this Request duplicates Request No. 33 to Glory Wealth.

4. In addition to the General Objections, Power objects to Request No. 4 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Any such drafts and documents are clearly protected from disclosure by Rule 26 of the Federal Rules of Civil Procedure.

5. In addition to the General Objections, Power objects to Request No. 6 [sic][1] to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects as this Request duplicates Request No. 18 to Glory Wealth.

6. In addition to the General Objections, Power objects to Request No. 5 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects as this Request duplicates Request No. 34 to Glory Wealth and overlaps significantly with Request Nos. 27, 29, 31, 32, and 33 to Glory Wealth.

---

[1] Request No. 6 appears twice, once before Request No. 5, and a different Request No. 6 which appears after Request No. 5.

7. In addition to the General Objections, Power objects to the second Request numbered No. 6 [sic] to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth and to the extent it is duplicative of documents and information, not otherwise objectionable, that Glory Wealth is required to disclose pursuant to Rule 26(a)(2). In communicating with Michael Brown, Power is acting on behalf of Glory Wealth, and such communications, to the extent they are not protected from disclosure, will be produced by Glory Wealth in its discovery responses.

8. In addition to the General Objections, Power objects to Request No. 7 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 7 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth and to the extent it is duplicative of documents and information, not otherwise objectionable, Glory Wealth is required to disclose pursuant to Rule 26(b)(2).

9. In addition to the General Objections, Power objects to Request No. 8 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 8 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

10. In addition to the General Objections, Power objects to Request No. 9 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 9 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

11. In addition to the General Objections, Power objects to Request No. 10 to the extent it seeks the production of information and documents protected by the attorney-client

privilege or work product doctrine. Power also objects to Request No. 10 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

12.     In addition to the General Objections, Power objects to Request No. 11 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 11 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

13.     In addition to the General Objections, Power objects to Request No. 12 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 12 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

14.     In addition to the General Objections, Power objects to Request No. 13 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 13 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

15.     In addition to the General Objections, Power objects to Request No. 14 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 14 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

16.     In addition to the General Objections, Power objects to Request No. 15 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 15 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

17.     In addition to the General Objections, Power objects to Request No. 16 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 16 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

18.     In addition to the General Objections, Power objects to Request No. 17 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 17 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

19.     In addition to the General Objections, Power objects to Request No. 18 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 18 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

20.     In addition to the General Objections, Power objects to Request No. 19 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 19 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

21.     In addition to the General Objections, Power objects to Request No. 20 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 20 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

22.     In addition to the General Objections, Power objects to Request No. 21 to the extent it seeks the production of information and documents protected by the attorney-client

privilege or work product doctrine. Power also objects to Request No. 21 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

23.    In addition to the General Objections, Power objects to Request No. 22 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 22 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

24.    In addition to the General Objections, Power objects to Request No. 23 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 23 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

25.    In addition to the General Objections, Power objects to Request No. 24 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 24 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

26.    In addition to the General Objections, Power objects to Request No. 25 to the extent it seeks the production of information and documents protected by the attorney-client privilege or work product doctrine. Power also objects to Request No. 25 to the extent it is duplicative of Requests issued by Freight Bulk to Glory Wealth.

## OBJECTIONS TO TOPICS FOR EXAMINATION IDENTIFIED IN THE POWER SUBPOENA

1.    In addition to the General Objections, Power objects to Topic 1 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

2. In addition to the General Objections, Power objects to Topic 2 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

3. In addition to the General Objections, Power objects to Topic 3 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

4. In addition to the General Objections, Power objects to Topic 4 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

5. In addition to the General Objections, Power objects to Topic 5 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

6. In addition to the General Objections, Power objects to Topic 6 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

7. In addition to the General Objections, Power objects to Topic 7 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine.

This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

8.      In addition to the General Objections, Power objects to Topic 8 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

9.      In addition to the General Objections, Power objects to Topic 9 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.

10.     In addition to the General Objections, Power objects to Topic 10 to the extent it seeks testimony protected from disclosure by attorney-client privilege or work product doctrine. This topic also duplicates the 30(b)(6) Notice issued to Glory Wealth and numerous documents requests propounded on Glory Wealth by Freight Bulk.


Dated:      New York, New York
           April 30, 2014

                            BY:    Holland & Knight LLP

                            /s/ Michelle T. Hess
                            Michelle Hess (VSB#71080)
                            *Attorneys Pro Se and for James Power*
                            31 West 52nd Street,
                            New York, NY 10019
                            (212) 513-3200
                            (212) 385-9010 (facsimile)
                            michelle.hess@hklaw.com

                            /s/ James H. Power
                            James H. Power (admitted *pro hac vice*)

31 West 52nd Street,
New York, NY 10019
(212) 513-3200
(212) 385-9010 (facsimile)
James.power@hklaw.com

*Attorneys for Consolidated Plaintiff*
*Glory Wealth Shipping Pte Ltd.*

## CERTIFICATE OF SERVICE

I certify that on the 30th day of April, 2014, a true copy of the foregoing was served via email on counsel of record as follows:

Patrick M. Brogan
DAVEY & BROGAN, P.C.
101 Granby Street, Suite 300
Norfolk, Virginia 23510
pbrogan@daveybroganpc.com

Carmine R. Zarlenga
Adam L. Hudes
MAYER BROWN LLP
1999 K Street, NW
Washington, D.C. 20006-1101
czarlenga@mayerbrown.com
ahudes@mayerbrown.com
*Attorneys for Defendant Freight Bulk PTE, LTD.*

Steven M. Stancliff
CRENSHAW, WARE & MARTIN, P.L.C.
150 W. Main Street, Suite 1500
Norfolk, VA 23510
sstancliff@cwm-law.com

Lauren Brooke Wilgus
William Robert Bennett III
Nicholas Robert Tambone
BLANK ROME LLP
405 Lexington Avenue
New York, New York 10174
lwilgus@blankrome.com
wbennett@blankrome.com
NTambone@BlankRome.com
*Attorneys for Plaintiffs Flame S.A.*

Mark T. Coberly
Dustin M. Paul
VANDEVENTER BLACK LLP
101 W. Main Street
500 World Trade Ctr
Norfolk, VA 23510
mcoberly@vanblk.com
dpaul@vanblk.com
*Attorneys for Interested Party Vitol S.A.*

John Joseph Reilly
Paul Myung Han Kim
SQUIRE SANDERS LLP
30 Rockefeller Plaza, 23rd Floor
New York, NY 10112
john.reilly@squiresanders.com
paul.kim@squiresanders.com

David Harlen Sump
Leonard Leroy Fleisig
WILLCOX & SAVAGE PC
Wells Fargo Center
440 Monticello Ave, Suite 2200
Norfolk, VA 23510
dsump@wilsav.com
lfleisig@wilsav.com
*Attorneys for Intervenor Plaintiff Noble Chartering Inc.*

/s/Michelle T. Hess
Michelle T. Hess (VSB#71080)
HOLLAND & KNIGHT LLP
31 West 52nd Street
New York, NY 10019
(212) 513-3200
(212) 385-9010 (facsimile)
michelle.hess@hklaw.com
*Attorneys for Consolidated Plaintiff*
*Glory Wealth Shipping Pte Ltd.*

## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

FLAME S.A.,               )
                              )
      Plaintiff,          )
                              )
GLORY WEALTH SHIPPING PTE LTD. )     Case No. 14 Misc. 0146
                              )
      Consolidated Plaintiff,  )
vs.                          )
                              )
INDUSTRIAL CARRIERS, INC.     )
VISTA SHIPPING, INC., and      )
FREIGHT BULK PTE. LTD.,     )
                              )
      Defendants.        )

RECEIVED

MAY 2 2014

JUDGMENT CLERK'S OFFICE

## NOTICE OF MOTION

PLEASE TAKE NOTICE that, upon the accompanying Declaration of Robert Hamburg, dated May 12, 2014, and the exhibits attached thereto, and the accompanying Memorandum of Law, and any other submission that shall be made in support of this motion, the undersigned counsel, on behalf of FREIGHT BULK PTE. LTD, will move this Court pursuant to Rule 45(d)(2)(B)(i) of the Federal Rules of Civil Procedure, to Compel Compliance with the Subpoena Issued to James H. Power Esq, before the Part 1 judge at 10:00 AM on the 3rd day of June, 2014 at the United States Courthouse, 500 Pearl Street, New York, New York, 10007. This motion seeks an Order directing the establishment of a date-certain for James H. Power, Esq. to be deposed, and for other such relief that the Court deems just and proper.

1

Dated: May 12, 2014                    Respectfully submitted,

                              By:   /s/ _____
                                   Robert W. Hamburg
                                   MAYER BROWN LLP
                                   1675 Broadway
                                   New York, NY 10019-5820
                                   Tel: 212.506.2500
                                   Fax: 212.262.1910


                                   *Attorney for Specially Appearing*
                                   *Defendant FREIGHT BULK PTE. LTD*